OPINION OF THE COURT
Fuchsberg, J.
Plaintiff Donald Riviello, a patron of the Pot Belly Pub, a Bronx bar and grill operated by the defendant Raybele Tavern, Inc., lost the use of an eye because of what was found to be negligence on the part of Joseph Waldron, a Raybele employee. The jury having decided for the plaintiff, in due course the trial court entered a judgment in his favor for $200,000 plus costs and interest from the date of the verdict. It later amended the judgment to reflect a payment of $25,000 which the plaintiff had received in advance of trial from Waldron’s personal liability insurer in return for a general release conditioned upon a reservation of plaintiff’s rights against Raybele.
*301 On plaintiffs appeal to us, the principal issues we confront are: (1) whether, as a matter of law, Waldron’s negligence, which Riviello sought to impute to Raybele on the theory of respondeat superior, was outside the scope of the employment and, if not, (2) whether, under section 15-108 of the General Obligations Law, the prejudgment settlement between plaintiff and Waldron operated to bar any recovery by plaintiff against Raybele, an assertion on which, in the light of the ground for the Appellate Division’s decision, it did not have to pass. For the reasons which follow, we believe both questions should be answered in the negative.
The relevant facts are easily set forth. And, because, in the posture in which the case comes to us, our examination focuses on whether plaintiff established a prima facie case against Raybele, we, of course, do so in the light most favorable to the plaintiff (De Wald v Seidenberg, 297 NY 335, 336-337).
As was customary, on the Friday evening on which Riviello sustained his injuries, only two employees manned the Pot Belly. One was the bartender. The other was Waldron, who, in this modest-sized tavern, wore several hats, primarily that of short-order cook but also the ones that went with waiting on tables and spelling the bartender. Though his services had been engaged by Raybele’s corporate president in the main to improve business by introducing the sale of food, his testimony showed that the fact that, as a local resident, he was known to most of the customers in this neighborhood bar figured in his hiring as well. There was also proof that, in the time he had been there, when not preparing or serving food or relieving the bartender, he would follow the practice of mingling with the patrons.
Nor was Riviello a stranger when he entered the premises that night. Living nearby, he had frequented the establishment regularly for some years. The two men knew one another and, after a while, Riviello gravitated to the end of the bar near the kitchen, where, during an interval when he had no food orders to fill, Waldron and another patron and mutual friend, one Bannon, were chatting. Riviello joined in the discussion, which turned to street crime in the neighborhood. In the course of the conversation, Waldron exhibited a knife, variously described as a pocketknife or, according to Bannon, a boy scout knife, containing a small blade and screwdriver attachment, which he said he carried for protection. At this *302 point Waldron broke away to go to the kitchen to fill a food order for another patron. Several minutes later, while Waldron was returning from his chore to rejoin Bannon and Riviello, the latter suddenly turned and, as he did so, his eye unexpectedly came in contact with the blade of the knife which Waldron still had in his hand. On defendant’s case, Waldron largely confirmed these facts, but added that he was "flipping” the knife, presumably as one might flip a coin, as he was coming from the direction of the kitchen and inadvertently struck the plaintiff. No one else so testified.
Applying the pertinent legal precepts to this factual framework, we first note what is hornbook law: the doctrine of respondeat superior renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment (Mott v Consumers’ Ice Co., 73 NY 543; 2 Mechem, Agency [2d ed], § 1874). The definition of "scope of employment”, however, has not been an unchanging one.
Originally defined narrowly on the theory that the employer could exercise close control over his employees during the period of their service, as in other tort law contexts (see, e.g., Codling v Paglia, 32 NY2d 330, 339-341), social policy has wrought a measure of relaxation of the traditional confines of the doctrine (see Restatement, Agency 2d, § 219, Comment [a]). Among motivating considerations are the escalation of employee-produced injury, concern that the average innocent victim, when relegated to the pursuit of his claim against the employee, most often will face a defendant too impecunious to meet the claim, and that modern economic devices, such as cost accounting and insurance coverage, permit most employers to spread the impact of such costs (see Prosser, Torts [4th ed], § 69; Seavey, Agency, § 83).
So, no longer is an employer necessarily excused merely because his employees, acting in furtherance of his interests, exhibit human failings and perform negligently or otherwise than in an authorized manner. Instead, the test has come to be " 'whether the act was done while the servant was doing his master’s work, no matter how irregularly, or with what disregard of instructions’ ” (Jones v Weigand, 134 App Div 644, 645, quoted in Baker v Allen & Arnink Auto Renting Co., 231 NY 8, 12-13 [Pound, J.]).
Thus formulated, the rule may appear deceptively simple but, because it depends largely on the facts and circumstances peculiar to each case, it is more simply said than applied (see *303 Riley v Standard Oil Co., 231 NY 301, 304). For, while clearly intended to cover an act undertaken at the explicit direction of the employer, hardly a debatable proposition, it also encompasses the far more elastic idea of liability for "any act which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act” (2 Mechem, Agency [2d ed], § 1879, p 1461). And, because the determination of whether a particular act was within the scope of the servant’s employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury (Rounds v Delaware Lackawanna & Western R. R. Co., 64 NY 129, 137-138; see McLoughlin v New York Edison Co., 252 NY 202, 208; Note, 45 U of Cin L Rev 235, 236).
That is not to say there are no useful guidelines for assessing whether the conduct of a particular employee, overall, falls within the permissible ambit of the employment. Among the factors to be weighed are: the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated (see Prosser, Torts [4th ed], § 70, p 461; Restatement, Agency 2d, § 229).
The first of these criteria need not detain us. The Pot Belly was the arena in which Waldron worked, and the evening was the time when he did so. The route from the kitchen where he would hold forth as chef to the patrons in the public room in which he performed his other functions could hardly be claimed to be a physical deviation. As to past employment practices, there was evidence that the friendly relations which Waldron enjoyed with the majority of the pub’s patrons and the expectation that these would be exploited to enhance the popularity of the pub entered into the hiring itself. The implementation of this plan, pursued continuously until the day Riviello was injured, almost of necessity had to depend largely on Waldron’s own personality and his judgment of how different patrons were to be handled. Pertinently, we suggest that, even if the jury had found no express understanding that Waldron would socialize, it could have drawn the inference from the nature of his job that his interaction with those visiting the premises would be a concomitant of the employment.
*304 Surely, the fact that Waldron, at the precise instant of the occurrence, was not plying his skills as a cook, waiter or bartender did not take him beyond the range of things commonly done by such an employee. The intermittent demands of his work meant that there would be intervals in which his function was only to stand by awaiting a customer’s order. Indeed, except perhaps in a world of complete automation, as portrayed for instance in Charlie Chaplin’s classic film "Modern Times”, the busiest of employees may be expected to take pauses and, when they do, engage in casual conversation, even punctuated, as here, by the exhibition to others of objects they wear or carry on their persons.
We turn then to the extent of Waldron’s departure, if it may be so characterized, from the normal methods of his performance, and to whether the specific act of carrying the pocketknife in his hand was one that the employer could reasonably have anticipated. Initially, it bears noting that for an employee to be regarded as acting within the scope of his employment, the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected (see 2 Mechem, Agency [2d ed], § 1884). As indicated earlier, it suffices that the tortious conduct be a natural incident of the employment. Hence, general rather than specific foreseeability has carried the day even in some cases where employees deviated from their assigned tasks (see Makoske v Lombardy, 47 AD2d 284, affd 39 NY2d 773 [negligent use of personal car by employees after training session for which they were required to be away from home overnight]; Basile v Huntington Utilities Fuel Corp., 47 AD2d 625 [truck garaged at an employee’s home over weekend used to assist fellow employee personally held within scope of employment]).
Indeed, where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment (see, e.g., Sims v Bergamo, 3 NY2d 531, 534-535 [assault of unruly patron by bartender to protect employer’s property and to maintain order on premises]; De Wald v Seidenberg, 297 NY 335, 337-338, supra [assault of tenant by building superintendent during attempted enforcement of occupancy rules]).
Given all this, it was permissible to find as a fact that Raybele could have anticipated that in the course of Waldron’s varied activities in the pursuit of his job, he might, *305 through carelessness, do some injury. The specifics of the act, though it was not essential that they be envisaged, could be, as here, the product of an inattentive handling of the pocketknife he had described to Riviello and Bannon, or a similar mishandling of a paring knife he could have had in his hand as he left the kitchen, or perhaps a steak knife with which he was on his way to set a table. Or, perchance, instead of a knife, with equal nonmalevolence it could in similar fashion have been a pen, a comb, a nail file, a pencil, a scissors, a letter opener, a screwdriver or some other everyday object that he was displaying. In any of these cases, an instant of inattention could render each an instrument of injury.
Further, since, as a result of our decision, this case will return to the Appellate Division for consideration of the facts, it is not amiss to add the following observations: Waldron's own testimony that he had "flipped” the knife (though not intending any injury) was no part of plaintiffs case. If it had been, it is not to be assumed that this kind of motion, any more than would the twirling of a chain containing sharp-pointed keys or the tossing of a coin, or some other gesture, whether used as an aid to communication or an outlet for nervous energy, would be beyond the broad ambit of the employer’s general expectation. For one employing men and women takes them subject to the kind of conduct normal to such beings.
We now focus on the second issue — the applicability of subdivision (a) of section 15-108 of the General Obligations Law to Riviello’s claim against Raybele. In pertinent part, that section states that a release given to one of two or more tort-feasors liable for the same injury will reduce a plaintiffs claim against the other tort-feasors by whichever is the greatest among (1) the amount of the release, (2) the consideration paid for it, or (3) "the amount of the released tortfeasor’s equitable share of the damages” under CPLR article 14.* *306 Raybele argues, not without some facial justification, that since it is only vicariously liable by virtue of its status as employer, the "equitable share” of Waldron, the released tortfeasor, is 100% and, hence, its own liability is now zero.
The flaw in Raybele’s argument lies in the presumed equivalence between its claim of indemnification against Waldron and a claim of contribution under CPLR article 14. The right of contribution arises among several tort-feasors who share culpability for an injury to the plaintiff and whose liability may be equitably apportioned according to fault (Dole v Dow Chem. Co., 30 NY2d 143, 148-149). Indemnity, however, flows from either a contractual or other relationship between the actual wrongdoer and another, such as that of employee and employer, and involves a complete shifting of the loss. (See Rock v Reed-Prentice Div., Package Mach. Co., 39 NY2d 34, 38-39; McFall v Compagne Mar. Belge, 304 NY 314, 327-328; Prosser, Torts [4th ed], § 50.)
Even upon a cursory reading of the statute, it becomes evident that section 15-108 is meant to be read in conjunction with the contribution rights set forth in article 14 (see Rock v Reed-Prentice Div., supra, pp 39-40). It is of no small significance that the proviso Raybele interprets as prohibiting plaintiff’s recovery contains an explicit reference to that article, the legislative codification of the apportionment rule announced in Dole v Dow Chem. Co. (30 NY2d 143, supra). As we have emphasized elsewhere, Dole "was hardly intended to overturn basic and satisfactory principles of common-law indemnification * * * [but] applies to those who in fact share responsibility for causing the injury or harm, and does not extend further to those who are only vicariously liable, as the employer of a negligent employee.” (Rogers v Dorchester Assoc., 32 NY2d 553, 565-566; see Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co., 45 NY2d 551, 577; Kelly v Diesel Constr. Div. of Carl A. Morse, Inc., 35 NY2d 1, 6; cf. Kelly v Long Is. Light. Co., 31 NY2d 25, 30). Moreover, by its express terms CPLR article 14 has been so limited, section 1404 (subd [b]) stating, "Nothing contained in this article shall impair any right of indemnity or subrogation under existing law”.
Further evidence of the linkage between section 15-108 and the article 14 rights comes from the section’s purpose. The design in large measure was to clarify the effect of settlements in multiparty tort suits in the wake of Dole and CPLR article 14 and to promote, rather than deter, the consensual disposi *307 tion of cases (see Rock v Reed-Prentice, supra, pp 40-41). This unsettling potential has not gone unnoticed (see McLaughlin, Practice Commentary, McKinney’s Cons Laws of NY, Book 23A, General Obligations Law, § 15-108, p 719; McLaughlin, Practice Commentary, Book 7B, CPLR 1404:2, p 382; see, also, Lipsig, Effect of Settlement Under GOL 15-108, NYU, April 26, 1979, p 1, col 1; p 2, col 3). Nor is it any less obvious that the interpretation urged by Raybele would contravene the policy bases for the imposition of vicarious liability on employers, a consequence we are loath to imply absent clearer indication that the Legislature intended any such result.
Since, therefore, it appears to us that the section should be read to harmonize with CPLR article 14, we hold that section 15-108 of the General Obligations Law does not foreclose a plaintiff negligently injured by an employee from recovering against an employer on a theory of vicarious liability despite the plaintiffs prior execution of a release running to the negligent employee.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted for review of the facts.

 Subdivision (a) of section 15-108 of the General Obligations Law reads: "Effect of release of Or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor’s equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.”