RAYMOND T. O'BOYLE, Individually and as Administrator of the Estate of ADELE M. O'BOYLE, Deceased, et al., Respondents-Appellants, v AVIS RENT-A-CAR SYSTEM, INC., et al., Appellants-Respondents, et al., Defendants.

Second Department, January 19, 1981

APPEARANCES OF COUNSEL

*A. Paul Goldblum* for Avis Rent-A-Car System, Inc., appellant-respondent.

*Anthony J. Caputo, P. C. (Joseph J. Buderwitz, Jr.,* of counsel), for Gladys R. House, as Executrix of the Estate of G. Roland House, appellant-respondent.

*Clark, Gagliardi & Miller (Henry C. Miller* and *Lawrence T. D'Aloise, Jr.,* of counsel), for Raymond T. O'Boyle, as Administrator of the Estate of Adele M. O'Boyle and another, respondents-appellants.

*O'Keeffe & Moloney (Richard J. O'Keeffe* of counsel), for Raymond T. O'Boyle, individually, and as Administrator of the Estate of Ann Marie O'Boyle, respondents-appellants.

OPINION OF THE COURT

LAZER, J.

The tragic vehicular accident underlying this action occurred when a 16-year-old employee at a gasoline station from which an Avis car rental agency was being operated drove in a rental car to pick up lunch, tarried briefly with his girlfriend passenger, and during the return collided with another automobile, killing two of its occupants and seriously injuring two others. In their ensuing action, the victims or their representatives alleged, *inter alia,* that the collision was caused not only by the conduct of the employee, Robert Bruno, but also by the direct and vicarious negligence of the defendant G. Roland House, who owned the gas station and car rental agency, and the defendant Avis Rent-A-Car System, Inc., the owner of the car. At the conclusion of a trial on the issue of liability, the jury rendered a twofold verdict: (1) that Bruno (who defaulted in the action) did not have permission to drive the car; and (2) that the accident was caused by the negligence of Avis and House. The latter now appeal from the interlocutory judgment of liability against them and the plaintiffs cross-appeal from the determination that Bruno had no per-

mission to drive the car. Resolution of the appeals is complicated by the fact that the case was submitted to the jury on separate theories of direct and vicarious negligence, but the verdict rendered against the defendants was a general one, disclosing no information as to the theory or theories the jury relied upon in imposing liability. As a consequence, the verdict can survive only if it is determined that both theories of negligence against each defendant have adequate support in the record. Analysis of the factual backdrop is crucial to our determination.

## I

In 1965 House commenced operating an Avis rental franchise from his gasoline station in Mount Kisco. Although no written agreement existed between Avis and House, their oral arrangement provided that information concerning each rental contract, including mileage, was to be entered in a computer Avis maintained at the station. Under this system, use of a car for nonrental purposes would create a mileage discrepancy, but according to an Avis employee who testified at the trial, a discrepancy of less than five miles would not be noted by his company. House employed a full-time mechanic to perform minor repair work at the station and at various times hired boys ranging from 14 to 16 years in age as part-time employees. The duties of these youngsters, some of whom, like Bruno, were not licensed to drive, included selling gasoline, renting vehicles, running the computer, refueling Avis cars and moving them about on the premises when necessary. During periodic inspections of House's premises, Avis representatives saw these young employees driving company vehicles on the station. On Sunday afternoon and from 5:30 P.M. to 9:00 P.M. on other nights, House would depart, leaving a boy or boys in full charge of his operations with keys to all of the cars.

On March 17, 1974 Sunday sales of gasoline were still banned due to the Arab oil embargo and the House station was open solely for the purpose of renting Avis cars. House arrived at 10:00 A.M., stayed for about an hour, and left Bruno alone and in charge for the balance of the day. At about 1:30 P.M., Greg Adams, another young House em-

ployee, appeared at the station to work on his own car and agreed to "watch the station" while Bruno and his girlfriend went to pick up a pizza which would provide lunch for Adams and Bruno. Although Adams was under the impression that Bruno was going to walk up the street to get the pizza, he saw the latter take a key off a rack and drive away in an Avis car.

After the pizza was purchased at Leonardi's, an establishment variously estimated as being one-eighth of a mile to two or three miles from the station, Bruno drove to a nursery in Armonk where he and his girlfriend "talked for about twenty minutes". When they left the nursery, it was Bruno's intention to drive the girl home and return to work, but about a mile from her house and a mile from the House station the car went out of control, entered the opposing lane of traffic, and crashed head-on with a car driven by Adele O'Boyle. Mrs. O'Boyle and her infant daughter perished while her husband and mother suffered serious injuries.

At the trial, conflicting evidence was adduced as to who was authorized to operate Avis vehicles and where and for what purpose they could be driven. House testified that he instructed Bruno "not to take an Avis car off the property under any conditions" but that he could drive Avis cars on the service station property. Although House said that this instruction was given to all employees, when asked whether he had ever authorized any licensed employee to take Avis cars off the premises, he replied that he had done so in certain emergency situations such as jump-starting a car or digging a customer out of a snow bank. House maintained that such occurrences were relatively rare and he usually would accompany his employee in rendering aid to the customer, after which the employee would drive the disabled car back to the station.

This testimony was supported by the deposition of Greg Adams, who was 14 years old and unlicensed when hired by House in 1972. Adams declared that his duties then were to "pump gas [and] rent Avis cars," that he had authority from House to drive Avis cars to and from gas pumps on the premises, and that this was observed on a number of oc-

casions by Avis representatives. Adams asserted that on his first day on the job House advised him that there was to be "[n]o driving the Avis cars off the property" and that the direction was repeated to him at least once a week for a period of two years. Because Adams had recommended Bruno for the job, he was present during the latter's job interview and heard House say that Avis cars were not to be driven off the premises. Adams recalled only one occasion during his 22 months of employment preceding the accident when an Avis car was taken off the premises by a House employee in order to make a service call.

Countervailing evidence was offered by another part-time House employee, Perry Palazzetti, who testified at the trial. Palazzetti was 16 years old and unlicensed when hired in July, 1973, although he obtained a license shortly afterwards. In February, 1974, after closing the station, he drove an Avis car off the premises, and was apprehended in Connecticut for speeding. Palazzetti remembered some 10 to 15 instances when House had instructed him to drive Avis cars on service calls "for both purposes, Mr. House's purposes and Avis purposes" and about 10 other occasions when House directed a particular licensed employee to take an Avis car out for a service call. He was not asked, however, whether House had ever admonished him or anyone else never to take an Avis car off the premises.

Bruno's testimony, taken by deposition, tended to contradict House and Adams. Responding to a question as to whether House had ever told him not to drive an Avis car on a public highway, Bruno said that "he probably told me on the first day but not after that." A few answers later, however, he asserted that House "never made any mention of my not taking any cars off the premises." Avis and House subsequently attacked Bruno's credibility by offering his admission that some three years after the accident he had told his psychiatrist that he did not have permission to take the car.

## II

As the trial began, Avis and House stipulated to the absence of contributory negligence on the part of the plain-

tiffs and that the operation of the offending Avis vehicle had been grossly negligent and was the competent producing cause of the injuries and deaths in the O'Boyle car. The trial court agreed to the parties' request that the jury should be asked to make findings as to what were described as two issues: the first was whether Bruno had express, implied or constructive permission under the Vehicle and Traffic Law to use the Avis vehicle on March 17; the second—relating to negligence—was whether defendants Avis and/or House were negligent in the hiring, training and supervision of the franchisee and the franchisee's agents, respectively, and whether Bruno was within the scope of his employment and in furtherance of Avis' business when he drove the Avis vehicle off the House property on March 17 so as to render defendants Avis and House vicariously liable for Bruno's acts. Despite the multi-faceted nature of these questions concerning negligence, the jury was asked to render nothing more than a general verdict as to whether each defendant was negligent. The court advised the jurors that a finding for defendants on the matter of permissive use would not preclude a verdict against them on the issue of negligence, but that if permissive use was decided against the defendants, it would not be necessary to consider negligence.

The trial court's charge concerning negligence included the following:

"the complaint of the Plaintiff, very basically and very briefly as against Mr. House as to negligence is in the selection of untrained and unqualified employees, failing to properly train his employees and in permitting untrained operator [sic] to operate automobiles in the [sic] and about his automobile service station and failure to supervise the operation of the automobiles in and about and from his automobile service station * * *

"Then, as far as the Defendant Avis is concerned * * * that they [sic] were negligent in failing to supervise its agents, in failing to supervise its franchises' agents in the operation of its automobile rental agencies, failing to prop-

erly train its franchises' agents in the operation [and] management and so forth of the rental agency * * *

"We come down to the question of Mr. House's responsibility here, question of his negligence * * * I'm going to talk about employer, employee, master and servant * * * and I'm going to talk about principal and agent * * * Now, an employer is not responsible for the acts of his employee unless the act of the employee is in furtherance of the employer's business and within the scope of [the] employee's authority. Now, I'm going to just read that again and I'm going to substitute two words: A principal is not responsible for an act of his agent unless the act is in furtherance of the principal's business and within the scope of the agent's authority. Same would be true with master, servant. An act is within the scope of the employee or agent's authority if it is performed while he is engaged generally in the business of his employer or principal to which he was assigned or if his act may be reasonably said to be necessary or incidental to such employment. The employer or the principal need not have authorized the specific act in question. If you find that, in the connection with House's responsibility, that Bruno, within the scope of his authority and [in] furtherance of Mr. House's business, negligently caused injury to the Plaintiff[s], then you would hold the Defendant responsible * * *

"Now, as to agency, the agency of Avis, I have indicated to you that in that connection with employer/employee situations, that the principal, Avis, would be responsible for any act of negligence on the part of its agent House, provided and only provided that such acts of negligence were within the scope of his authority and in furtherance of his employer's business."

As we have noted, this submission of two distinct concepts of negligence under which each defendant could be held liable was unaccompanied by any request that the jurors answer written interrogatories or render special verdicts concerning their findings (see CPLR 4111). The gravity of the omission stems from the familiar rule that where multiple theories of liability or damages are tendered to the jury, a general verdict in plaintiff's favor can stand only if

all the theories are sustained by the evidence *(Killeen v Reinhardt,* 71 AD2d 851; *Brandt Corp. v Warren Automatic Controls Corp.,* 37 AD2d 563; *Finkle v Zimmerman,* 26 AD2d 179; *Atlantic Bank of N.Y. v Carnegie Hall Corp.,* 25 AD2d 301; *Dore v Long Is. R.R. Co.,* 23 AD2d 502; *Thomas v Central Greyhound Lines,* 6 AD2d 649, 653; see, also, *Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31). Absent the details which could have been provided by special verdicts or answers to interrogatories, we are deprived of knowing whether the jury's verdict was based on the belief that House was directly negligent for failing to properly supervise or train or even hire Bruno, vicariously negligent because Bruno's action fell within the scope of his employment by House, or negligent on both grounds. Neither do we know whether Avis was found directly negligent because it failed to properly supervise or train either its agent House or his employees, vicariously negligent because of House's negligent acts as its agent, or both. If the record reveals an insufficiency of support for either theory posited against House, the verdict against both defendants must fall, for it may be that Avis was held liable solely on the basis of vicarious responsibility for House's conduct (see *Hamilton v Presbyterian Hosp. of City of N.Y.,* 25 AD2d 431, app dsmd 17 NY2d 719).

Whether a general verdict based upon multiple theories of liability is tenable depends on its ability to survive a two-stage legal and factual analysis. The reviewing court must first determine the legal question of whether the evidence in support of each theory was sufficient to create a factual issue; and then, if it was, whether the verdict of liability can withstand the factual challenge that it was contrary to the weight of the evidence. For a court to conclude as a matter of law that a jury's decision was not supported by sufficient evidence requires a harsh and basic assessment of the verdict, for the consequence of insufficiency is judgment for the adversary *(Cohen v Hallmark Cards,* 45 NY2d 493). To set aside a verdict on grounds of insufficiency, the reviewer must find "that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial"

*(Cohen v Hallmark Cards, supra,* at p 499). The test is functionally equivalent to that utilized on a motion to dismiss at the conclusion of a plaintiff's case—whether there is evidence enough to create a factual question which therefore "is sufficient to sustain the jury's resolution of that factual question" *(Dominguez v Manhattan & Bronx Surface Tr. Operating Auth.,* 46 NY2d 528, 532). In deciding whether it was "utterly irrational for [the] jury to reach the result" (see *Cohen v Hallmark Cards, supra,* p 499) as to either direct or vicarious negligence, the evidence must be viewed in the light most favorable to the plaintiffs (see *Blincoe v Newsday, Inc.,* 26 AD2d 687; *Prince v City of New York,* 21 AD2d 668), who must be accorded every favorable inference which reasonably can be drawn (see *Lee v Lesniak,* 40 AD2d 756; *Matlick v Long Is. Jewish Hosp.,* 25 AD2d 538).

The comparatively discretionary nature of the second test —weight of evidence analysis—derives from the fact that the party deprived of triumph on such principles may yet have a further opportunity to establish his cause at retrial. When weight of evidence is the issue, a verdict for the plaintiff may not be disregarded unless the evidence so preponderates in favor of the defendant that it could not have been reached on any fair interpretation of the evidence (see, e.g., *Loeb v Teitelbaum,* 77 AD2d 92; *Marshall v Mastodon, Inc.,* 51 AD2d 21; *Knise v Shearer,* 30 AD2d 741; *Merced v Harris,* 26 AD2d 523; *Marton v McCasland,* 16 AD2d 781). Rationality, then, is the touchstone for legal sufficiency, while fair interpretation is the criterion for weight of the evidence.

## III

We conclude that the verdict against both defendants is tenable because each negligence theory posited against them can withstand the required analysis. As to direct negligence, it is undisputed that House hired underage and unlicensed youngsters and placed them in charge of his business during his absences. On the day of the tragedy, Bruno was left alone in control of the service station with unlimited access to all the Avis vehicles despite the fact that only four weeks earlier Palazzetti had pocketed a set of keys and taken off

with an Avis car, resulting in his discharge. Although there is some conflict in the evidence as to how often and under what circumstances Avis vehicles were utilized to advance House's service station operations, the jury could fairly have credited Palazzetti's testimony that Avis cars frequently were put to such use. The jury also could reasonably have drawn the inference that House was negligent in hiring youngsters as employees, in failing to provide for their proper training or in leaving them unsupervised and in sole control of his premises and the Avis vehicles they were permitted to operate on it. Once such inferences are drawn, the foreseeability of a repetition of the Palazzetti adventure or some variation of it is neither irrational nor contrary to the weight of the evidence.

As far as Avis' negligence is concerned, the record reveals that no training programs, manuals or written instructions were provided for its agents or their employees. Avis' weekly visits to the station were neither purposed toward nor motivated by considerations of safety. If the basis for the jury's verdict against Avis was negligence in failing to properly train, supervise or control its agents or their employees or vicarious liability for House's negligence in hiring or in failing to train, supervise or control his employees, considerations of rationality and weight of evidence would not overcome a determination that the cited omissions were the proximate cause of the accident and that Avis, as principal, was responsible for House's misdeeds or omissions as its agent.

We have deferred for last, consideration of the most troublesome issue in the case—whether Bruno's negligent act fell within the scope of his employment. Foreseeability is the State's current criterion for measuring an employer's liability for conduct of employees whose behavior is alleged to have taken them beyond the scope of their employment. In a *respondeat superior* context, foreseeability differs significantly from the " 'foreseeably unreasonable risk of harm that spells negligence' " *(Bushey & Sons v United States,* 398 F2d 167, 171). It is a foresight which must impel the prudent man to " 'perceive the harm likely to flow from his long-run activity in spite of all reasonable precautions on his own part.' " The test thus is more similar to that utilized

in workers' compensation litigation than in circumstances where direct negligence is the question *(Bushey & Sons v United States, supra,* at p 171). Although *Makoske v Lombardy* (47 AD2d 284, affd 39 NY2d 773 on the opn at the Appellate Division) is the first New York case clearly indicating acceptance of foreseeability as a standard for judging scope of employment issues, the seminal authority is *Bushey & Sons (supra)*. In *Bushey*, the United States was held liable for the damages caused by a drunken sailor who, in the course of return from shore leave, turned a number of large wheels at the gangway where his ship was berthed and flooded the plaintiff's drydock. Conceding that the seaman's act was in no conceivable way within the "scope of his employment" since it was not "actuated, *at least in part,* by a purpose to serve the master" (see Restatement, Agency 2d, § 228, subd [1], par [c]; emphasis supplied), Judge FRIENDLY observed (p 171) that the usual focus upon the employee's motive of furthering the employer's business was highly artificial since "a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities." Therefore, the inebriated seaman's conduct was "not so 'unforeseeable' as to make it unfair to charge the Government with responsibility" *(Bushey & Sons v United States, supra,* at p 171).

*Makoske (supra)* involved a group of employees who attended a management training session in Saratoga, New York. The accident occurred while the employees were driving to the race track after having finished their training session and dined. The *Makoske* court held that "[w]hether the activities of these employees were in furtherance of their employer's interest, or merely a deviation from the scope of employment for purely personal reasons", was a matter for the jury (47 AD2d, at p 288). Speaking for the Third Department, Justice KANE reasoned (p 288): "The furtherance of interest question often turns on a decision of whether the employee's activity is incidental to the employer's business or is wholly separate and apart from it [citations omitted]. *If there is a departure from specific or designated activity, consideration must then be given to the foreseeability of the occurrence arising from the particular deviation to determine whether it could be fairly considered*

*a related risk.*" (Citing *Bushey & Sons v United States*, 398 F2d 167, *supra;* emphasis supplied.)

In *Makoske (supra)*, the initial activity of driving a car to the Saratoga seminar was clearly incidental to the furtherance of the employer's interest. It is equally apparent that the sojourn to the race track was purely personal to the employees. However, since the first activity benefited the employer, the second might have been a risk attendant to the first and reasonably foreseeable to the employer. Both activities might therefore be risks of the business to be borne by the employer.

Despite its affirmance in the Court of Appeals, *Makoske's* reception by the judicial system was less than overwhelming (see, e.g., *Goldfarb v Hudson*, 75 AD2d 775; *Nero v Ris Paper Co.*, 60 AD2d 340; *Tortora v La Voy*, 54 AD2d 1036), and only *Riviello v Waldron* (47 NY2d 297) has carried the day for foreseeability. The actor in *Riviello* was a short-order cook who, while mingling with patrons at his employer's bar as he was wont to do, began "flipping" a knife and accidentally struck the plaintiff in the eye. In concluding that the scope of authority issue was for the jury, the Court of Appeals observed (p 304) that: "for an employee to be regarded as acting within the scope of his employment, the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected".

Plainly, then, the focus of our own inquiry must be upon the foreseeability of Bruno's conduct in taking a car to get his lunch. The jury knew that House was aware of Bruno's ability to drive and it was within the jury's discretion to believe testimony that Avis cars often had been utilized in the course of the service station business. An employer takes men and women "subject to the kind of conduct normal to such beings" *(Riviello v Waldron, supra,* p 305) and, obviously, young persons subject to the kind of conduct normal to them. Whether it was foreseeable over the long run of House's operation that in the course of activities in furtherance of his employer's interest an employee—even a young one—would take an Avis car to obtain lunch was a matter for the jury to decide. Considering the evidence and the in-

ferences drawable from it, the jury's imposition of vicarious liability upon House cannot be deemed a defiance of rationality or contrary to the weight of the evidence.

Our resolution in favor of affirmance is unaffected by the jury's verdict that Bruno did not have permission to drive an Avis car within the meaning of subdivision 1 of section 388 of the Vehicle and Traffic Law. Whether Bruno had permission to use an Avis car within the meaning of the Vehicle and Traffic Law is a different question from whether it was foreseeable by the employer under all the circumstances that Bruno would drive an Avis car off the premises without permission. An employee who acts in direct contradiction of his employer's instructions can still be within the scope of his employment *(Rounds v Delaware, Lackawanna & Western R.R. Co.,* 64 NY 129, 134; *Brown v Town of Bolton,* 19 AD2d 668; *Jones v Weigand,* 134 App Div 644; PJI 2:236) and the court so instructed the jury.

Accordingly, there must be an affirmance.

HOPKINS, J. P., TITONE and COHALAN, JJ., concur.

Interlocutory judgment of the Supreme Court, dated December 20, 1979, and entered in Westchester County, affirmed insofar as appealed from, with one bill of costs payable jointly to plaintiffs by appellants-respondents.