■ THOMAS J. VITTORE, Respondent, v CITY OF NEW YORK, Appellant. MICHAEL J. SLOANE et al., Respondents, v CITY OF NEW YORK, Appellant. — In negligence actions to recover damages for personal injuries, etc., the City of New York appeals from an interlocutory judgment of the Supreme Court, Kings County (Scholnick, J.), entered October 17, 1979, which is in favor of plaintiffs and against it, following a jury trial limited to the issue of liability only. Interlocutory judgment affirmed, without costs or disbursements. No opinion. Hopkins, Mangano and Cohalan, JJ., concur.

Mollen, P.J., dissents and votes to reverse the interlocutory judgment and grant a new trial, with the following memorandum: In my view, the jury's verdict in this case was against the weight of the credible evidence. Accordingly, I respectfully dissent and would reverse the interlocutory judgment and grant a new trial. These are negligence actions arising out of a motorcycle accident which occurred on the Hamilton Avenue exit ramp of the Brooklyn-Queens Expressway. The evidence adduced at trial established that on April 16, 1972, plaintiff Thomas Vittore was working as a "night man coordinator" at the Manumit Manor, a Brooklyn drug rehabilitation center affiliated with St. Leonard's Church. Vittore had entered the center some eight months before as a heroin addict, following a long history of drug abuse and narcotics related criminal offenses. At the center, Vittore had successfully freed himself of drug dependency and now, as its night co-ordinator, he was responsible for overseeing its residents. He was also in charge of answering the program's 24-hour hotline. On the date of the accident, Vittore was working a midnight to 9:00 A.M. shift. He was scheduled to take an hour-long "lunch" break at 5:00 A.M. Plaintiff Michael Sloane, who also had a long history of drug addition, was the center's staff co-ordinator. Sloane arrived at the center at 5:00 A.M. to make an unannounced spot inspection of the premises. He arrived on the second-hand motorcycle he had purchased from a friend some three weeks before. At Sloane's suggestion, he and Vittore left the center to take a ride on the motorcycle. Vittore drove while Sloane rode as a passenger behind him. Vittore claimed to have previously driven the motorcycle on several occasions for a total driving time of about one hour. Neither he nor Sloane, however, had a motorcycle license. The two men rode through the streets and then drove onto the Brooklyn-Queens Expressway. According to Vittore, they were traveling at approximately 40 miles per hour as they approached a two-lane ramp leading off the highway to Hamilton Avenue. Vittore reduced his speed to 25 miles per hour by shifting from third to second gear. The ramp curves to the left and Vittore testified that he took the curve by "let[ting] off on the gas" and coasting around it. He could see only about 20 feet in front of him as he proceeded around the turn. As he did so, he noticed black spots or patches which appeared to be smooth and level. They were scattered randomly over the width of the left lane. Vittore and Sloane both claimed that, when they hit the patches, the motorcycle's front wheel went into a hole causing Vittore to lose control of the vehicle. The rear wheel subsequently entered the hole and the motorcycle crashed into a guardrail, throwing both men to the roadway. Each sustained injuries in the fall. At trial, the city called Police Officer Kevin Maroney, the first officer to arrive at the scene of the mishap. Testifying on the basis of recollection refreshed by the accident reports he had prepared, Officer Maroney stated that, as part of his investigation, he had inspected the area of the roadway for a distance of some 100 feet leading to the point where the motorcycle lay. He had observed no potholes or defects in the roadway. The only cause for the accident listed on the officer's report was that the "operator

lost control of the vehicle." On the question of whether the city had constructive notice of the alleged defects in the roadway prior to the accident, the only evidence came from Vittore himself, who testified as follows: "Q Now, had you ever been around that curb [curve?] prior to that time? A Yes. Q About how long before the accident was that? A About ten months. Q And were you in a vehicle at that time? A Yes. Q Were you the driver or the passenger? A A passenger. Q What kind of a vehicle was it? A It was a Chevy, I don't know what year. It was a Chevy. Q Can you tell us what occurred at that time in that vehicle? A I had taken a ride with a friend of mine to go.pick up some truck parts for his truck. Q Was he in the left lane also? A Yes. Q And what happened? A He went around the turn and he hit the holes in that area also and I remember, you know, we bounced up against the same situation and he started cursing. Q You say he started cursing? A Right. Q Now, between that time and the morning of the accident, were you back to that area? Between that time ten months before and the morning of the accident, were you back to that location at all? A No *** Q You were on ten months before and you noticed a pothole at the Hamilton Avenue Exit? A Yes, I remember that specific spot, because my friend hit it — the car jumped up and he cursed. That is the only other time I was on the road. Q And ten months later you go over the same road and hit the same pothole? A Yes. Q And you know for a fact it was the same pothole? A The same identical one, no. Q Was it the same identical place where your friend was riding? A Yes. Q What's the name of this friend, Mr. Vittore? A Vinnie Kroasch (phonetic spelling). Q Where is Vinnie Kroasch today? A A butcher somewhere in Queens. Q Did you ask him to come in and testify? A No." On this evidence the jury found for the plaintiffs, and the majority of this court now upholds the verdict. I find myself unable to join my colleagues in doing so. The verdict here necessarily reflects an acceptance of the plaintiffs' testimony that they had been thrown off the vehicle as a result of driving into a pothole so deep that, according to Vittore, it made the motorcycle react as if it had hit a curb some six to eight inches high. Hence, the jury rejected the suggestion that the mishap had occurred due to a driving error by the relatively inexperienced and unlicensed Vittore. The jury rejected as well the testimony of the disinterested police officer who reported that his examination of the scene of the accident revealed no potholes or other defects in the roadway, much less a pothole of the depth suggested by Vittore. Moreover, as previously noted, only Vittore testified on the crucial issue of the city's constructive notice. He claimed that some 10 months before the incident, he had been a passenger in a car which had hit a pothole while riding over precisely the same stretch of roadway. Significantly, at the time this earlier incident allegedly occurred, Vittore, by his own admission, was a heroin addict, "using drugs very heavy" and "getting high every day." Yet the jury credited his testimony that, as a passenger in a car and possibly under the influence of heroin, his driving over a pothole in a particular area would so strongly register in his mind as to enable him to recall and report the event 10 months later. And this, notwithstanding the strong contrary inference which arises from the plaintiffs' failure to call as a witness the alleged driver of the car in question although Vittore claimed that he knew his name, his line of work and the location of his employment. (See *Noce v Kaufman,* 2 NY2d 347, 353.) Hence, we are faced with a jury determination which not only rejected a police officer's testimony that the roadway was free of potholes and defects on the day of the accident, but which also found, based solely upon the alleged recollection of an isolated incident by an interested witness, that the same potholes and defects in the road were there 10 months earlier. Mindful of the deference generally due to a jury's factual determinations, I nevertheless cannot agree that the finding at bar ought to be sustained. (Cf. *Lopez v Union*

*Settlement Assn.,* 25 AD2d 520.) In view of the foregoing, I am compelled to conclude that the jury made erroneous factual findings and that its verdict was so inconsistent with the weight of the evidence that it could not have been reached on any fair interpretation thereof. (See *Mormilo v Allied Stevedores Corp.,* 7 AD2d 966; *Mann v Hunt,* 283 App Div 140; *Bottalico v City of New York,* 281 App Div 339; cf. *O'Boyle v Avis Rent-A-Car System,* 78 AD2d 431, 439.) Accordingly, I vote to reverse the judgment and remand the case for a new trial. (See *Cohen v Hallmark Cards,* 45 NY2d 493.)