Robert **ESSIG** and Jacqueline Essig, Plaintiffs,

v.

**UNITED STATES of America and Edward Hamill, Defendants.**

No. CV 85–1720.

United States District Court, E.D. New York.

Dec. 11, 1987.

Stephan Persoff, Carle Place, N.Y., for plaintiffs.

Andrew J. Maloney, U.S. Atty. by Kevan Cleary, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

Plaintiffs Robert and Jacqueline Essig brought suit under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA"), to recover against defendant United States of America for personal injuries resulting from a collision between a bicycle ridden by Robert Essig and a government owned vehicle driven by Special Agent Edward P. Hamill of the United States Drug Enforcement Administration ("DEA"). The Court bifurcated the trial of plaintiff's action and heard the issue of defendants' liability. The Court now renders the following Findings of Fact and Conclusions of Law.

### FACTS

The DEA employed Hamill as a special agent in narcotics investigation on and prior to August 6, 1984. Hamill's primary responsibility involved posing undercover as a drug trafficker in order to identify and apprehend individuals illegally dealing in narcotics. Hamill was based at the DEA's offices in Melville, New York, which are located in the Huntington Quadrangle on Route 110.

The DEA assigned Hamill an official government vehicle to be used in connection with his duties. He was authorized to store the vehicle at his home and to use it to commute to and from his office or any other location to which his duties required he travel.

On August 6, 1984, Hamill reported to work at approximately 10:00 a.m. and spent a good deal of the day filling out expense vouchers and attempting to telephone an informant who would in turn set up a meeting for later that evening between Hamill and a narcotics trafficker at a bar known as A J and Friends in Atlantic Beach, New York. Hamill also tried to contact Agent Fred Eiselle in order to obtain his assistance in connection with the meeting Hamill was attempting to arrange.

At approximately 4:30 p.m., Hamill left his office and went to the Quad Lounge, a bar in the basement of the same building in which the DEA offices were located. Agent Cregan, a co-worker of Hamill's, accompanied him to the bar but left at about 5:45 p.m. Hamill's supervisor, Leonard Williams, joined Hamill in the bar sometime between 6:00 p.m. and 6:30 p.m. Williams had a ten to fifteen minute discussion with Hamill then left the bar.

Hamill was at the bar until approximately 7:15 p.m. and while there he consumed a number of alcoholic beverages. During that time, he unsuccessfully attempted to place several calls from a public phone outside the bar to the informant with whom he was planning to meet later that night. Hamill also telephoned Agent Eiselle regarding his possible participation in the meeting. The bartender of the Quad Bar testified that in his opinion Hamill was drunk when he left the bar. Hamill went back to his office after leaving the bar to clean up some papers and try again to reach the informant. He then went into the bathroom adjacent to his office.

Agent Eiselle testified that when he arrived home at approximately 8:00 that evening, there was a message from Hamill on his telephone answering machine informing Eiselle that Hamill was arranging a meeting between himself, an informant, and a drug trafficker, and requesting Eiselle's assistance as a back-up agent. In the message, Hamill asked Agent Eiselle to call him at his home at 9:00 p.m. Agent Eiselle was unable to ascertain the time that the

message was recorded. At roughly 9:00 p.m. Agent Eiselle called the home of Agent Hamill, but there was no answer.

At approximately 9:00 that evening, Hamill, while driving the DEA vehicle entrusted to him, collided with a bicyclist on the shoulder of the southbound lane of Route 110, near the intersection of Michaels Avenue in Farmingdale. Hamill did not stop the car upon colliding with the cyclist, but continued to drive the government vehicle in the general direction of his home. The Court finds that the most convenient and direct way to travel from the DEA's offices in Melville to Hamill's home in Point Lookout, New York would be to go south on Route 110 to the Southern State Parkway, westbound. In order to travel this route, Hamill would necessarily pass the location where the accident occurred.

Hamill testified that he had no recollection of the accident and that he had no memory whatsoever of any event which occurred between the time he went into the bathroom near his office, at approximately 7:30 p.m., and the following morning when he awoke to find that the windshield of the DEA vehicle had been smashed. On the day following the accident, Hamill replaced the windshield at a local body and fender repair shop, paying over $200.00 for the repair out of his personal funds. Hamill also testified that prior to his memory loss, it was his intention to drive to his home in Point Lookout to await Agent Eiselle's call.

On August 17, 1984, Agent Hamill was arrested and charged with leaving the scene of an accident and reckless endangerment. He pled guilty to those charges in the Suffolk County District Court.

## DISCUSSION

The United States of America as sovereign is immune from suit except to the extent it consents to be sued. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1986). Congress, in enacting the FTCA has waived the federal government's absolute immunity. Section 1346(b) of the FTCA provides:

"... [T]he district courts ... shall have exclusive jurisdiction of civil actions, on claims against the United States, for money damages ... for injury or loss of property; or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b). To determine whether liability should be imposed in this instance, the Court must apply the law of New York State, the place where the accident occurred.

### I.

The first issue the Court will address itself to is whether Agent Hamill was acting within the scope of employment at the time of the accident. In rendering this decision the Court must act in its fact finding capacity as this is a question appropriate for the trier of the facts. *Riviello v. Waldron*, 47 N.Y.2d 297, 303, 418 N.Y.S.2d 300, 303, 391 N.E.2d 1278, 1281 (1979); *Quadrozzi v. Norcem Inc.*, 125 A.D.2d 559, 509 N.Y.S.2d 835 (2d Dep't 1986). The test set forth by the New York Court of Appeals for making such a determination is "whether the act was done while the servant was doing his master's work, no matter how irregularly or with what disregard of instruction." *Riviello*, 47 N.Y.2d at 302, 418 N.Y.S.2d at 302, 391 N.E.2d at 1280 (citations omitted). The *Riviello* Court enumerated five factors to be used as guidelines to evaluate the nature of the employee's conduct. These are:

(1) "the connection between the time, place and occasion for the act;" (2) "the history of the relationship between employer and employee as spelled out in actual practice;" (3) "whether the act is one commonly done by such an employee;" (4) "the extent of departure from normal methods of performance;" and (5) "whether the specific act was one that the employer could reasonably have anticipated."

*Riviello,* 47 N.Y.2d at 303, 418 N.Y.S.2d at 303, 391 N.E.2d at 1281 (citations omitted). As the case law developed after *Riviello,* the New York courts, while generally considering all the factors *Riviello* set forth, placed greater emphasis on the fifth factor, which examines the likelihood of the employee behaving in the manner that caused the injury. The question of foreseeability became central to the decision of whether liability should properly fall upon the employer. The reasoning underlying this approach is simply that if an enterprise can foresee risks as incidental to its business activity, then by continuing to pursue that activity it necessarily assumes those risks and consequences that attach. The essential inquiry is therefore whether the government could reasonably foresee Hamill's collision with Essig.

■ The government granted Hamill permission to use the car for official business as well as to commute to and from his home and office. The government issued official vehicles to the DEA agents because, in its view, the agents would be better able to further the business of the government if they had access to such vehicles at all times. There is no question that the government was aware that Hamill would be driving the vehicle to commute from his office, and that any risk normally associated with the operation of a motor vehicle was part and parcel of its decision that DEA agents should retain possession of government vehicles even upon retiring from their official duties for the night.

As to the remaining *Riviello* factors, on this particular occasion Hamill was not merely going to his home to engage in his own business or pleasure but rather was acting in furtherance of his employer's business by going home with the understanding that he would be receiving a call from a fellow agent who would then accompany him to a meeting he was planning for that evening. The accident happened between the time Hamill was arranging for the meeting and the time he intended it to take place, and occurred on the route which Hamill generally travelled between his home and office. Thus the time, place and occasion of the collision suggest that Hamill was within the scope of employment during its occurrence.

The history of the relationship between Hamill and the DEA as spelled out in actual practice is also consistent with a finding that Hamill was within the scope of employment at the time of the accident. It was an established practice of the DEA to issue government vehicles to its undercover agents and to allow them to store the vehicles at their place of residence. DEA agents traditionally were called upon to perform in an undercover capacity after conventional office hours, and therefore might be using a government vehicle at any time. Thus it was not a departure from normal methods of performance for Hamill to drive the government vehicle to his home to await Agent Eiselle's call concerning the meeting he was planning for later that night.

Defendant argues that Hamill was not within the scope of his employment at the time of the accident as his conduct of socializing in the Quad Bar and consuming alcoholic beverages constitutes an abandonment of his official capacity. Although the Court agrees that while in the Quad Bar Hamill was not furthering his employer's business but was instead pursuing personal enjoyment, upon leaving the bar, Hamill resumed his official responsibilities. Hamill returned to his office to place a call to the informant and then travelled home in order to effectuate his plans to meet with the informant, drug trafficker, and Agent Eiselle that night. An employee may re-enter the scope of employment after engaging in personal frolic if a reasonable connection in time and space exists between the abandoned duties and the employees efforts to resume her responsibilities. *Tomack v. United States,* 369 F.2d 350 (2d Cir.1966). Hamill's abandonment and subsequent resumption of his duties both occurred in the same location and therefore demonstrate a close spacial relationship. In addition, the recommencement took place in the building where Hamill typically discharged a large part of his duties.

Regarding the temporal relationship between Hamill's abandonment and re-entry into the scope of employment, although several hours had passed during which Hamill was not acting in his employment capacity, the Court finds Hamill resumed his official responsibilities within a reasonable time under the circumstances. As noted earlier, Hamill's job description called for him to keep unusual business hours and the nature of his position was such that large gaps often existed between the times he was discharging employment duties within a single day. The amount of time Hamill spent on personal frolic in the Quad Bar was consistent with his being available to pursue the government's business later that night.

The fact that Hamill was intoxicated while attempting to further his employer's goals similarly does not remove his conduct from within the realm of employment. *See Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167 (2d Cir.1968) (United States held liable for damage to a drydock resulting from the mischievous conduct of a drunken seaman who returned to his ship after shore leave); *McConville v. United States*, 197 F.2d 680 (2d Cir.) *cert. denied*, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679 (1952) (army sergeant, who was sent on assignment in an army vehicle but instead embarked on a one and one half hour drinking spree, found to be within the scope of his employment during a collision he caused while proceeding back to the assigned course from which he deviated). " 'Men [and women] do not discard their personal qualities when they go to work. " 'Into the job they carry their intelligence, skill, habits of care and rectitude. " 'Just as inevitably they take along their tendencies to carelessness and camaraderie, as well as emotional make-up.' " *Ira S. Bushey & Sons Inc.*, 398 F.2d at 171 (quoting *Hartford Accident & Indemnity Co. v. Cardillo*, 72 App.D.C. 52, 112 F.2d 11, *cert. denied*, 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940). *See also Riviello*, 47 N.Y.2d at 305, 418 N.Y.S.2d at 304, 391 N.E.2d at 1282 ("one employing men and women takes them subject to the kind of conduct normal to such beings"). Business enterprises are aware of the human fallacies inherent in their employees and the risks that they create and cannot, therefore, disclaim responsibility for the costs that result. *See Ira S. Bushey & Sons, Inc.*, 398 F.2d at 170–72; *Riviello*, 47 N.Y. 2d at 304, 418 N.Y.S.2d at 303, 391 N.E.2d at 1281. *See also O'Boyle v. Avis Rent–A–Car System, Inc.*, 78 A.D.2d 431, 435 N.Y. S.2d 296 (2d Dep't 1981) (court found employer liable for injury caused by fourteen year old employee who borrowed, without permission, a car from employer's fleet in order to obtain lunch, reasoning that it was foreseeable that the young employee might drive one of the cars for his personal enjoyment).

Although a sad commentary on the state of our society, the Court recognizes that individuals entrusted with the operation of a motor vehicle will all too often fail to exercise the proper degree of care necessary for safe travel. Even more unfortunate is the high number of people who will attempt to operate a car in an inebriated condition. These facts are certainly within the government's knowledge. The government, although aware of the risks, chose to issue to its DEA agents official vehicles for use in field assignments as well as for the purpose of commuting between their homes and employment locations. The Court assumes that the government believed that its ends would be better served by issuing the vehicles and that it was not merely a gesture of kindness directed at these employees. Therefore, the government must assume the costs associated with its decision and be accountable for the foreseeable consequences.

Similarly, the mere existence of employer prohibitions against tortious conduct on the part of the employee cannot absolve the employer of liability when the employee, in serving the master's interests, violates the prohibitions. *Cepeda v. Coughlin*, 128 A.D.2d 995, 513 N.Y.S.2d 528 (3d Dep't 1987). Therefore, the government's argument that DEA agents were instructed not to imbibe intoxicating beverages while on duty is of no consequence. In addition, the fact that Hamill failed to stop after causing

the collision does not necessarily bring his conduct outside the realm of employment. "Leaving the scene of an accident, while reprehensible, does not *per se* remove [an employee] from the line of duty." *Mandelbaum v. United States*, 251 F.2d 748 (2d Cir.1958). The Court finds that Hamill was acting within the scope of his employment when he collided with Robert Essig and therefore the government is vicariously liable to the plaintiffs under the FTCA.

## II.

In addition to being liable under the theory of *respondeat superior* for the tortious conduct of employees acting within the scope of employment, the government is also accountable under New York Vehicle and Traffic Law § 388. Section 388(1) provides in pertinent part:

> Every owner of a vehicle used or operated in this State shall be liable and responsible for death or injuries to person or property resulting from the negligence in the use or operation of said vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner.

Section 388(1)'s liability is based upon ownership of the vehicle and is imposed regardless of the purpose for which the vehicle was loaned. As long as the driver has obtained the owner's permission for his use of the vehicle, the owner remains responsible for damage due to the driver's negligence, whether or not the use served the owner's interests. *Aetna Cas. and Sur. Co. v. Brice*, 72 A.D.2d 927, 422 N.Y.S.2d 203 (4th Dep't 1979), *aff'd* 50 N.Y.2d 958, 431 N.Y.S.2d 528, 409 N.E.2d 1000 (1980); *Sikora v. Keillor*, 17 A.D.2d 6, 230 N.Y.S. 2d 571 (2d Dep't 1962), *aff'd* 13 N.Y.2d 610, 240 N.Y.S.2d 601, 191 N.E.2d 88 (1963). Therefore, § 388(1) is a separate and broader source of vicarious liability than the doctrine of *respondeat superior*, which requires that the employee be acting to further the employer's business.

The government argues that § 388(1) is inapplicable as the FTCA provides for liability only where the government employee is acting within the scope of his employment. The Court declines to adopt the government's position that the FTCA is too narrow to encompass New York's "permissive use statute."

The FTCA requires that liability for the tortious conduct of employees serving the government will be imputed to the government "under circumstances where the United States, if a private person, would be liable to the claimant...." 28 U.S.C. § 1346(b). If a private citizen were to loan their automobile to another, under New York law the owner would be required to answer in damages for any injury resulting from the driver's permissible use. Similarly, the government should be held accountable for its decision to entrust a government owned vehicle to one of its employees. Section 388(1) holds vehicle owners responsible for mistakes of judgment with regard to whom they permit to operate their vehicles. The government, who one would expect to be cognizant of the value of prudence in decision making, should not be allowed to escape being held accountable for the harm that befalls the victims of its poor judgment.

Although never expressly ruling on the applicability of § 388(1) to such cases, the Second Circuit has cited § 388(1)'s predecessor statute and has engaged in some analysis of whether employees' uses of vehicles fall within the parameters of the statute in cases arising under the FTCA. In *Mandelbaum*, 251 F.2d at 750–51, the Second Circuit credited the predecessor statute of § 388, as it was interpreted by *Chaika v. Vandenberg*, 252 N.Y. 101, 169 N.E. 103 (1929), with creating a "presumption that the owner of a vehicle is responsible for the manner in which the vehicle is driven."

The Court was again faced with this question in *O'Toole v. United States*, 284 F.2d 792 (2d Cir.1960), *cert. denied*, 366 U.S. 927, 81 S.Ct. 1648, 6 L.Ed.2d 387 (1961). *O'Toole* involved an agent of the Alcohol and Tobacco Unit who, upon returning to his office after a raid of a still, obtained permission from his supervisor to use a government vehicle for the specified purpose of transporting his baggage to his

home. The agent was under express instructions to go directly to his home and then immediately back so that the vehicle could be retired to the government garage by the end of the day. In direct violation of these orders, he instead frequented several bars where he socialized until after the time at which the vehicle was due back. The *O'Toole* Court cited its earlier decision in *Mandelbaum* with approval and affirmed the lower court's opinion that no liability should be imputed to the government as the driver's use of the government vehicle exceeded the permission granted. *Id.* at 796. The Court concluded its opinion with the following remarks:

> Perhaps some day under the Tort Claims Act there will arise a case where state law imposes liability upon the owner of an automobile who permits another to use it, whether or not it is used in the owner's business and whether or not it is used at a time and for a purpose specifically forbidden by the owner.
>
> \*   \*   \*   \*   \*   \*
>
> But [this] is not such a case; and we have no occasion to pass upon appellant's argument based upon the words "or otherwise" in [the predecessor statute to § 388].

*Id.* The Second Circuit reached a similar conclusion in *Tomack,* 369 F.2d at 352, holding that because of its decision that the employee used the government vehicle for a purpose not within the bounds of the permission granted, it was unnecessary to pass on the question of whether § 388 governed. In *Tomack,* a government employee was en route from Brooklyn to a business meeting in upstate New York. When he reached Catskill, New York he received word from his wife that a relative had died. He then reversed his travel direction and drove fifty miles to the funeral, after which he agreed to transport mourners to the cemetery and while en route there he collided with another car in the funeral procession.

Unlike *O'Toole* and *Tomack,* in the present case, it is clear that Hamill's use of the vehicle did not exceed the permission provided by the DEA. The government gave Hamill written authorization to use the vehicle for official business as well as commuting between his home and work locations. At the time of the collision, Hamill was commuting from the DEA's Melville office to his home. Since Hamill was driving a government owned car with the permission of the DEA, the government must redress the plaintiffs for their injuries caused by the driver to whom the government entrusted its vehicle.

## CONCLUSION

As to the liability portion of this case, the government is vicariously liable to the plaintiffs, under the FTCA, for the injuries caused to them by its employee, Hamill. At the time of the collision, Hamill was both acting within the scope of his employment and using the government vehicle with the express permission of the DEA. Accordingly, the government is accountable to plaintiffs pursuant to New York's doctrine of *respondeat superior* and § 388(1) as applied via the FTCA. The Court will contact the parties to arrange for a trial on the issue of damages, which remains unresolved.

SO ORDERED.