[626 NYS2d 455]

Margaret Adams, Respondent, v New York City Transit Authority, Appellant.

First Department, May 2, 1995

## APPEARANCES OF COUNSEL

*Garnett H. Sullivan* for respondent.

*Lawrence Heisler* of counsel *(Lawrence A. Silver* on the brief; *Albert C. Cosenza,* attorney), for appellant.

## OPINION OF THE COURT

Tom, J.

In this appeal, defendant-appellant the New York City Transit Authority (the Transit Authority) seeks to have this Court reevaluate the common carrier doctrine expounded in *Stewart v Brooklyn & Crosstown R. R. Co.* (90 NY 588 [1882]), and to find the doctrine no longer applicable and contrary to the tenor of modern tort law.

On June 28, 1986, at approximately 2:00 P.M. on a Saturday afternoon, plaintiff Margaret Adams and a friend entered the IRT subway station at Lexington Avenue and 60th Street after a shopping trip to Bloomingdales. As plaintiff approached the token booth, she overheard the clerk, a Ms. Chrystal Bowman, arguing with another individual standing in line ahead of her. Plaintiff subsequently reached the token booth window, slid money through the aperture and asked Ms. Bowman directions to 34th Street. Ms. Bowman responded by embarking on an expletive-filled diatribe and by refusing to give Ms. Adams directions. As a result, Ms. Adams retreated from the token booth and proceeded toward the turnstiles.

As Ms. Adams was proceeding through the turnstile after depositing her token, she was attacked and pummeled by Ms. Bowman from behind, and was struck on the neck, back and face, and choked. She was eventually rescued by other passengers. Ms. Adams thereafter dialed the 911 emergency assistance number to summon the police, who arrested Ms. Bowman after their arrival.

Plaintiff commenced the underlying action against the Transit Authority by the service of a summons and verified complaint on or about September 3, 1987. The complaint interposed two causes of action asserting a number of tort and negligence theories, including the negligent hiring, training and supervision of Ms. Bowman, respondeat superior, and that

the Transit Authority acquiesced in the conduct of its employee. After certain discovery was conducted, Ms. Adams moved, and the Transit Authority cross-moved, for summary judgment.

Plaintiff, for the most part abandoning the theories delineated in her complaint, asserted that the Transit Authority was absolutely liable to plaintiff by contract under the common carrier doctrine, although the damages sought arise out of tort. Relying on case law dating back to the 1800's, plaintiff contends that the fact the Transit Authority employee acted outside the scope of her employment is totally irrelevant under the doctrine.

The Transit Authority reasserted that it could not be held liable under the principle of respondeat superior and maintained that the common carrier doctrine, under which the plaintiff sought to impose absolute liability, should no longer be applicable.

The IAS Court, in a decision dated November 30, 1992, held that plaintiff was entitled to summary relief on the issue of liability "on a cause of action sounding in contract upon the theory of respondeat superior." The IAS Court, however, in view of the record before it, which included an in camera inspection of Ms. Bowman's employment record, dismissed plaintiff's claims of liability founded upon the alleged negligent training, hiring and supervision of Ms. Bowman as well as the assertion that the Transit Authority somehow acquiesced in the conduct of its employee.

The Transit Authority appeals from that part of the order which granted plaintiff partial summary judgment and denied its cross motion.

The IAS Court, in granting partial summary judgment against the Transit Authority for the employee's attack, relied primarily on the century-old ruling rendered by the Court of Appeals in *Stewart v Brooklyn & Crosstown R. R. Co. (supra),* and related cases which held that pursuant to a "contract of safe passage", a common carrier is absolutely liable for assaults perpetrated by its employees regardless of whether the employee was acting within the scope of his or her employment.

In *Stewart (supra,* at 591), plaintiff, after paying his fare, boarded defendant's cross-Brooklyn horse car only to be attacked by the intoxicated driver and "cruelly beaten" with the butt end of a whip. The *Stewart* Court *(supra,* at 590-591), in

reinstating plaintiff's complaint, held that: "By the defendant's contract with the plaintiff, it had undertaken to carry him safely and to treat him respectfully; and while a common carrier does not undertake to insure against injury from every possible danger, he does undertake to protect the passenger against any injury arising from the negligence or willful misconduct of its servants while engaged in performing a duty which the carrier owes to the passenger."

In order to appreciate the rulings of the *Stewart* Court and the concerns it sought to address, an analysis of the common carrier's liability with the advent of the locomotive train and the powerful steam engine in the nineteenth century is instructive.

The liability of the common carrier for lost or damaged goods had its genesis in Great Britain and originally held common carriers liable in tort for ordinary care (Baker, An Introduction to English Legal History, at 337-338 [2d ed 1978]). It was in England during the late sixteenth or early seventeenth century that the foregoing standard changed to one of strict liability (Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law,* 51 Ohio St LJ 1127, 1129-1130).

One of the primary policy reasons for the foregoing shift to a more stringent standard was the protection of the general public against any undiscoverable conspiracy between common carriers and highway robbers, a common hazard of the time *(Forward v Pittard,* 99 Eng Rep 953). The doctrine thereafter traversed the Atlantic Ocean and was quickly adopted, for the very same reasons, in the United States.

In *Cole v Goodwin* (19 Wend 251, 273), Mr. Justice Cowen observed that: " '[The doctrine] is grounded upon great equity and justice; for if [carriers] were not chargeable for loss of goods without assigning any particular default in them, they having such opportunity as they have by the trust reposed in them, to cheat all people, they would be so apt to play the rogue and cheat people, without almost a possibility of redress * * * for it would be in [the carrier's] power to combine with robbers, or to pretend a robbery or some other accident without a possibility of remedy to the [injured] party' " (quoting *Lane v Cotton,* 1 Salk 18; *see also, Philadelphia & Reading R. R. Co. v Derby,* 14 How [55 US] 468). The strict liability standard was, at that time, applied to the transportation of goods only as passengers were viewed as being able to care for themselves and maintain their own rights.

The common law, however, did not require much fault and imposed upon the carrier of passengers the highest degree of care that a reasonable man would use under the circumstances present (Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law, op. cit.,* at 1158). In *Stokes v Saltonstall* (13 Pet [38 US] 181, 191 [1839]), the Supreme Court, citing with approval to the English case of *Aston v Heaven* (2 Esp Rep 533), held that in a situation which results in an injury to a passenger, the carrier is answerable for the smallest negligence of its employees.

At the time the law concerning a carrier's liability was evolving, the development of the powerful steam engine represented a new, awesome and potentially destructive power, and an emerging concern for the courts. In *Corwin v New York & Erie R. R. Co.* (13 NY 42, 47), the Court of Appeals observed that: "[A] new state of things has arisen: a power, but recently discovered * * * has been appropriated as a motive power to the moving of large and heavy bodies at a velocity before unknown, acquiring a momentum and speed * * * putting in jeopardy the lives and limbs of all those who are connected with the train." *(See also, Philadelphia & Reading R. R. Co. v Derby, supra,* at 486 [in which the Supreme Court noted that where carriers undertook to convey passengers by the powerful and dangerous agency of steam, public policy as well as safety required they be held to the greatest possible care and diligence].)

The fear of these huge machines traveling at a velocity never before experienced was well documented. The air brake, the only device capable of quickly and effectively stopping railroad trains, was not invented until the second half of the 1800's and was not placed in general use until years later. "Before the air brake, trains simply could not quickly slow down. They sped through countryside, futilely clanging their bells, and all too often colliding with cattle, other trains or men." (Freidman, A History of American Law, at 412 [Simon & Schuster 1973].)

This era also saw the development of the theory, later found in *Stewart (supra)* and related cases, which stated that a common carrier was bound by contract to deliver its passengers safely to their destination. In *Chamberlain v Chandler* (3 Mason 242, 5 F Cas 413 [1823]), passengers on board a steamboat were rudely treated and bullied by the ship's master. The passengers sued in contract and the court held that the

master had breached the contract of safe carriage and would have to refund the price the passengers paid him. The court concluded that: "[The passenger's] contract * * * is not for mere ship room, and personal existence, on board; but for reasonable food, comforts, necessaries and kindness. It is a stipulation, not for toleration merely, but for respectful treatment, for that decency of demeanor, which constitutes the charm of social life" (5 F Cas, *supra,* at 414).

The doctrine evolved to the juncture that courts applied *Chamberlain's* contract principles to cases in which passengers were seeking recovery in tort and sought to hold the carriers vicariously liable for assaults committed by their employees. *(See, e.g., Stewart v Brooklyn & Crosstown R. R. Co., supra,* in which the defendant carrier was held liable for an unprovoked assault committed by its drunken horse-car driver; *Dwinelle v New York Cent. & Hudson Riv. R. R. Co.,* 120 NY 117, 126, where the Court of Appeals reaffirmed its holding in *Stewart* and held that "no matter what the motive is which incites the servant of the carrier to commit an unlawful or improper act toward the passenger * * * the carrier is liable for the act and its natural and legitimate consequences"; *Gillespie v Brooklyn Hgts. R. R. Co.,* 178 NY 347, in which defendant was held liable for its conductor's use of improper and insulting language after plaintiff asked for the correct change and a transfer; *Busch v Interborough R. T. Co.,* 187 NY 388, in which defendant was held liable for an assault committed by one of its employees upon plaintiff.)

The *Stewart* doctrine was premised on the Court's finding that the carrier had breached a "contract of safe passage", a fictitious contract created upon the purchase of the carriage ticket. As stated in *Stewart (supra,* at 592), "It is the defendant's failure to carry safely and without injury that constitutes the breach, and it is no defense to say that that failure was the result of the willful or malicious act of the servant."

While this antiquated and not-often used contract theory (the doctrine evolved primarily between the middle of the nineteenth century and 1907 *[see, Zeccardi v Yonkers R. R. Co.,* 190 NY 389]) has not been relied upon by a New York appellate court for approximately half of a century, the doctrine survives to this day *(see, e.g.,* Prosser and Keeton, Torts § 70, at 506-507 [5th ed]; Restatement [Second] of Agency § 214; PJI 2:239; 17 NY Jur 2d, Carriers, §§ 480, 481; Ill PJI [Civil] 100.04).

It is undisputed that the rail travel phobia of the nineteenth century was an event of the past and the concerns from which the theory of a "contract of safe passage" grew no longer exist. The common carrier doctrine should be reassessed and it should be determined whether its application is still viable under present tort law.

In *Vanderhule v Berinstein* (285 App Div 290, 297), the Appellate Division, Third Department, in discussing the common carrier rule, and recognizing its dated nature, stated that: "The rule originated in the early days of the railroads when travel was considered by many to be a dangerous adventure. The rule has been walled off from the rest of the law".

In *McLean v Triboro Coach Corp.* (302 NY 49, 51), the Court of Appeals, albeit in dicta, addressed the standard of care in negligence imposed upon a common carrier and observed that: "Negligence is defined, broadly and generally speaking, as the failure to employ reasonable care—the care which the law's reasonably prudent man should use under the circumstances of a particular case. That being so, it may well be asked whether it is ever practicable for one to use more care than one reasonably can; whether it is ever reasonable for one to use less; or whether, in sum, there can ever be more than one degree of care. * * * All of this suggests a re-examination of those decisions wherein this court has upheld instructions by trial judges to the effect that a common carrier does, in certain situations, owe a 'high', a 'very high' or the 'highest' degree of care in transporting its passengers [citations omitted]." *(See also, Rainey v Paquet Cruises,* 709 F2d 169, 171.)

In authoring the foregoing opinion, Judge Fuld, while not specifically addressing the issue of a common carrier's liability under a contract theory, certainly expressed some degree of dissatisfaction with the Court of Appeals practice of holding a common carrier to a higher degree of care in negligence actions. Although the foregoing might suggest a turning away from such higher standard, much less holding a carrier absolutely liable pursuant to an antiquated contract theory, the doctrine survived.

Common carriers were not the only entities subject to this strict liability standard as the same held true for innkeepers and hospitals. This was so as the relationship between passenger and carrier was viewed by the courts to be analogous to that between guest and innkeeper as well as that between

patient and hospital. With these relationships in mind, the rule's steady erosion is readily evident. In Prosser (Torts § 70, at 465 [4th ed]), it was stated that: "Even where the servant's ends are entirely personal, the master may be under such a duty to the plaintiff that responsibility for the servant's acts may not be delegated to him. This is true in particular in those cases where the master, by contract or otherwise, has entered into some relation requiring him to be responsible for the protection of the plaintiff. The employees of a carrier, for example, would be under a duty to a passenger to exercise reasonable care to protect him against assaults on the part of third persons, even for personal motives; and they are no less under a duty to protect him against their own assaults, which is the duty of the master as well. It follows that the master will be liable even for such entirely personal torts as the rape of a passenger. *The same is true of innkeepers and hospitals.*" (Emphasis added.)

In the following edition of this prominent treatise, Prosser and Keeton, Torts (§ 70, at 506-507 [5th ed]), the authors used almost the identical text but deleted the reference that the doctrine applied to hospitals and noted in a footnote that a New York case *(Moritz v Pines Hotel,* 52 AD2d 1020) held that a hotel was not liable to a guest assaulted by one of its porters because the assault was not within the employee's scope of employment, apparently abandoning any notion of strict liability.

Further, another New York case, *Cornell v State of New York* (46 NY2d 1032), recognized the narrowed application of this doctrine and held that the State was not liable for the sexual attack of a 14-year-old patient by an employee in a State mental health facility. The Court of Appeals, in dicta, did note that common carriers were an exception to the doctrine of respondeat superior under common-law principles, citing to *Stewart v Brooklyn & Crosstown R. R. Co. (supra),* but did not pass upon the merits of the exception.

With regard to *Cornell,* there can hardly be a more compelling situation in which the rule should maintain its efficacy. In *Cornell,* a 14 year old, who had been committed to a State mental hospital, was the victim of a homosexual rape perpetrated by a State hospital attendant. The Court of Appeals concluded that because the employee was acting outside the scope of his employment, the State was not liable. This conclusion must be viewed in light of the previous application of the strict liability standard to hospitals and because of the clear

analogy in the relationships between carrier-passenger and hospital-patient. It is clear that the patient, like the passenger, is under the control of, and in the care of, a large entity to which that individual is entrusting his/her safety. If anything, the facts in *Cornell* are more compelling than the instant case, as the plaintiff was an involuntary ward of the State whose ability to exercise his own free will was extremely curtailed.

In *Tobin v Slutsky* (506 F2d 1097), a 15-year-old girl was sexually attacked by an employee of the hotel at which she and her parents were staying. The Second Circuit Court of Appeals, in reviewing the applicable New York law, observed that the standard of care due a guest by an innkeeper was set forth over one-half century ago and that its import and content are far from clear. The court went on to note that the case law in which the standard was set forth analogized it to the relationship between carrier and passenger, as that relationship, and the standard of liability, were identical *(supra,* at 1100, citing *Stone v Eisen Co.,* 219 NY 205, 208-209; *Boyce v Greeley Sq. Hotel Co.,* 228 NY 106, 111; *de Wolf v Ford,* 193 NY 397, 406-407).

The United States Court of Appeals in *Tobin (supra,* at 1103) reversed the District Court, which had directed a verdict for plaintiff, and directed a trial utilizing a reasonable care standard. The court concluded that "[n]o matter how strict the standard, however, the hotel is not an insurer and proof of injury to a guest caused by a hotel employee should not entitle a plaintiff to a directed verdict."

There exists no discernable, clear mandate or valid legal reasoning as to why the doctrine of strict liability should be applied to cases involving common carriers and no longer to innkeepers and hospitals. To begin with, the doctrine has not been applied by a New York appellate court for approximately one-half century and evolved, as previously discussed, during the birth of rail travel when trains were "notable neither for speed nor for safety. They killed any object from a Minister of State to a wandering cow, and this naturally reacted on the law." (Winfield, *The History of Negligence in the Law of Torts,* 42 L Q Rev 184, 195 [1926].) The passenger, as a result, was viewed to be somewhat at the mercy of the carrier and subject to its whim.

With a view to the foregoing, the Court of Appeals observations in *McLean v Triboro Coach Corp. (supra,* 302 NY 49)

must also be considered. Therein, the Court appeared to frown on those cases where a common carrier was held to a higher degree of care in transporting its passengers.

Plaintiff's claims in this action are grounded in tort, not contract, and accordingly should be governed by the standard of care and responsibility as well as the resultant liability set forth in that body of law. It is clear that the theory of a "contract of safe passage" is no longer viable and that a common carrier should be held to the same standard of care imposed upon any employer.

Normally, an employer may be held vicariously liable under the doctrine of respondeat superior for a tort committed by an employee in the course of the performance of his or her duties, even if such duties are carried out in an irregular fashion or with disregard of instructions (*Riviello v Waldron,* 47 NY2d 297, 302; *Heindel v Bowery Sav. Bank,* 138 AD2d 787, 788; *Murray v Watervliet City School Dist.,* 130 AD2d 830, 831; *Jones v Weigand,* 134 App Div 644, 645). In order for liability to attach, the tortious act must have in some way been effectuated to advance the employer's interest (*Sauter v New York Tribune,* 305 NY 442, 445; *Santamarina v Citrynell,* 203 AD2d 57).

Liability will not attach, however, where the acts are outside the general scope of the employment or are done with a purpose foreign to the interests of the employer (*Sauter v New York Tribune, supra,* at 444; *Murray v Watervliet City School Dist., supra,* at 831; *Island Associated Coop. v Hartmann,* 118 AD2d 830, 831; *Stavitz v City of New York,* 98 AD2d 529; *Moritz v Pines Hotel,* 52 AD2d 1020, *supra;* Prosser and Keeton, Torts § 70, at 506 [5th ed]).

In *Riviello v Waldron (supra,* at 303), the Court of Appeals set forth some of the factors to be considered in determining the scope of employment as: "[T]he connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated [citations omitted]."

In view of the foregoing guidelines, coupled with the undisputed facts of this case, it is clear that the sudden, inexplicable acts of Ms. Bowman could not have been controlled or

foreseen by the Transit Authority. It is also clear that Ms. Bowman acted completely outside any possible definition of the scope of her employment which is primarily to sell tokens to commuters, and plaintiff has been unable to advance any interpretation of the facts to indicate otherwise. As a result, Ms. Bowman's conduct, under the doctrine of respondeat superior, is not chargeable to her employer *(Kirkman v Astoria Gen. Hosp.,* 204 AD2d 401, *lv denied* 84 NY2d 811; *Stavitz v City of New York, supra,* at 531-532; *Moritz v Pines Hotel, supra,* at 1020-1021, *Vargas v Correa,* 416 F Supp 266, 272; Prosser and Keeton, Torts § 70, at 506 [5th ed]).

Even if the common carrier doctrine were to remain undisturbed, the Court of Appeals in *Mulligan v New York & Rockaway Beach Ry. Co.* (129 NY 506), a case decided just 10 years after *Stewart,* limited the foregoing doctrine to acts committed by carrier agents who are entrusted with duties with respect to the execution of contracts for the transportation of passengers, thereby excluding ticket agents, such as in the present case.

In *Mulligan,* plaintiff and a friend entered defendant's station and purchased tickets with a five dollar bill. Shortly, thereafter, the ticket agent, who had been warned earlier by the police to look out for counterfeit five dollar bills, appeared on the station platform with two police officers who then arrested the men. The bill later turned out to be genuine and the men were released. Plaintiff subsequently brought an action for assault and false arrest and prevailed in the trial court.

The Court of Appeals reversed and held that, "[t]here can be no doubt that a conductor, or like agent of a carrier of passengers, who has them in his charge and under his care, may violate the duty which he owes to them * * * for which his principal may be held liable" *(supra,* at 512). The Court then found that the ticket agent who sold tickets behind a window counter was not an agent charged with the duties of carrying out the contract of transportation of passengers to bring it within the rule.

The *Mulligan* ruling clearly restricts the application of *Stewart* under the facts of this case. Likewise, Ms. Bowman was not acting for the protection of the Transit Authority's interest, but went beyond her line of duty when she bolted out of the ticket booth and assaulted plaintiff *(see, Palmeri v Manhattan Ry. Co.,* 133 NY 261).

Further, plaintiff's cause of action, grounded in breach of contract of safe passage based on a tort claim, would appear to be untenable in view of recent developments in tort law involving a publicly owned common carrier.

The Transit Authority is a public benefit corporation created by the New York State Legislature to perform what is an essentially governmental function by operating the transit system in New York City (Public Authorities Law §§ 1201, 1202; *Clark-Fitzpatrick, Inc. v Long Is. R. R. Co.*, 70 NY2d 382; *McKechnie v New York City Tr. Police Dept.*, 130 AD2d 466).

In *Weiner v Metropolitan Transp. Auth.* (55 NY2d 175), the Court of Appeals, in no uncertain language, held that the Transit Authority, in performing its governmental function, enjoys a policy-based immunity from liability for assaults on its passengers. In doing so, the Court distinguished the Transit Authority from other common carriers and held: "That a nongovernmental common carrier would be liable under the same factual circumstances is not determinative of the authority's liability. Its immunity from such liability rests upon the same considerations as does the immunity of a municipality or other governmental body from liability for failure to provide adequate police protection" *(supra,* at 178-179; *Serrano v City of New York,* 150 AD2d 297).

The Court in *Weiner* thereafter concluded that absent a special relationship between the Transit Authority and the claimant, the Transit Authority may not be liable for the failure to provide adequate police protection for its passengers *(see also, Cuffy v City of New York,* 69 NY2d 255).

While the holding in *Weiner* specifically dealt with the issue of assaults committed by third parties rather than the carriers' employees, and the allocation of police resources in those instances, there appears to be an inherent inconsistency with the present state of the law regarding the liability of a publicly owned carrier for assaults on its passengers. As expounded in *Weiner,* the Transit Authority is immune from liability for an assault on its passengers despite the fact that it had notice of previous attacks and robberies at the same location.

We have, therefore, reached a logical impasse, for how do we legally justify holding the Transit Authority absolutely liable in this case where no evidence of any negligence is present and at the same time finding it not liable in *Weiner*

when evidence of negligence exists. Following then, under what rationale does the "contract of safe passage" come into play with the holding in *Weiner?* Therefore, to hold the Transit Authority liable under a breach of contract theory in the within case where there would be no liability to all other defendant employers based on the doctrine of respondeat superior, is an illogical and unjust result.

In the final analysis, the fear engendered by the development of the steam-powered locomotive and the destructive power it possessed, which led to the imposition of strict liability against common carriers, was a phenomenon of the nineteenth century. The common carrier doctrine is an outdated remnant of a bygone era and is no longer viable and is, in all respects, inconsistent with the tenor of present-day tort law.

In the case at bar, in light of the fact that Ms. Bowman was acting totally outside the scope of her employment and that there was no evidence of negligent hiring as found by the lower court or any other negligence on the part of the Transit Authority, no potential liability attaches to defendant. Moreover, defendant was not liable to plaintiff pursuant to the interpretation of the contract of safe passage as it is set forth in *Mulligan v New York & Rockaway Beach Ry. Co. (supra)*.

Accordingly, the order of the Supreme Court, New York County (Eugene L. Nardelli, J.), entered on or about March 2, 1993, is reversed, on the law, to the extent appealed from, without costs, defendant Transit Authority's cross motion for summary judgment is granted in its entirety, and the complaint is dismissed. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

ROSENBERGER, J. P., ELLERIN and KUPFERMAN, JJ., concur.

Order, Supreme Court, New York County, entered on or about March 2, 1993, reversed, on the law, to the extent appealed from, without costs, defendant Transit Authority's cross motion for summary judgment granted in its entirety, and the complaint dismissed.