CROMER FINANCE LTD. and Prival N.V., et al., Plaintiffs,

v.

Michael BERGER, Fund Administration Services (Bermuda) Ltd., Ernst & Young International, Ernst & Young Bermuda, Kempe & Whittle Associates Limited, Deloitte & Touche (Bermuda), Deloitte Touche Tohmatsu, Deloitte & Touche L.L.P., Bear Stearns & Co., Inc., Bear Stearns Securities Corp., Financial Asset Management, Inc., and John Does 1–100, Defendants.

No. 00 Civ. 2284(DLC).

United States District Court, S.D. New York.

Feb. 18, 2003.

See, also, 2003 WL 203197.

Steven S. Honigman, Richard P. Swanson, Jonathan E. Polonsky, Veronica E. Rendon, Alexandera Khlyavich, Irena S. Brobston, Thelen Reid & Priest LLP, New York, NY, for Plaintiffs Cromer Finance, Ltd. et al.

Jeffrey H. Squire, Richard L. Stone, Mark A. Strauss, Kirby, McInerney & Squire, LLP, New York, NY, for Plaintiffs Cromer Finance, Ltd. et al.

Wesley G. Howell, Jr., John T. Behrendt, Mark B. Holton, Aric H. Wu, Denise McGinn, Gibson, Dunn & Crutcher LLP, New York, NY, for Deloitte Touche Tohmatsu.

*OPINION AND ORDER*

COTE, District Judge.

Plaintiffs Cromer Finance Ltd. ("Cromer") and Prival N.V. ("Prival") (collectively, the "Cromer Plaintiffs") filed this securities class action complaint on March 24, 2000. The plaintiffs were investors in an off-shore investment fund, the Manhattan Investment Fund (the "Fund"), managed

from New York by Michael Berger ("Berger"). That Fund traded United States securities, and the plaintiffs allege that the Fund lost in excess of $400,000,000.

The plaintiffs sued, among others, the Bermuda accounting firm that served as the Fund's auditor, Deloitte & Touche (Bermuda) ("DTB"), as well as the Swiss verein of which it was a member, Deloitte Touche Tohmatsu ("Deloitte"). After the claims against Deloitte were dismissed, fundamentally because the complaint failed sufficiently to allege Deloitte's scienter, plaintiffs successfully moved to amend their complaint and reassert their action against Deloitte, based on a theory of agency.

Deloitte now moves for summary judgment on all claims against them. This motion addresses the extent to which Deloitte's organized efforts at globalization make partners who are responsible for that effort its agents and thereby allow those partners' scienter to be imputed to Deloitte. One of the individuals responsible for Deloitte's globalization program was also the partner at DTB responsible for the Fund's audit. Finding that the Cromer plaintiffs have raised questions of fact regarding whether that partner's knowledge of the Fund's audit was within the scope of his work as an agent of Deloitte, Deloitte's motion is denied. Trial is scheduled for October 13, 2003.

*Procedural History*

To understand the context for this summary judgment motion, it is useful to describe two prior opinions in this action: the Opinion in 2001 dismissing Deloitte from this action, *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452, 498 (S.D.N.Y. 2001) ("April 17 Opinion"), and the Opinion in 2002 granting leave to amend the pleadings and reassert claims against Deloitte, *Cromer Finance Ltd. v. Berger*, 2002 WL 826847, at *13 (S.D.N.Y. May 2, 2002)

("May 2 Opinion"). Each of these Opinions is described below and incorporated by reference.

*Motion to Dismiss*

Plaintiffs asserted eight causes of action against DTB in their original complaint: violation of Section 10(b) of the Securities Exchange Act ("Section 10(b)"), violation of Rule 10b–5, aiding and abetting common law fraud, aiding and abetting breach of fiduciary duty, common law fraud, gross negligence, negligence and professional malpractice. Plaintiffs brought all of these causes of action against Deloitte as well, adding a claim for violation of Section 20(a) of the Securities Exchange Act.

Plaintiffs' claims against Deloitte were dismissed in the April 17 Opinion. The flaw in the case against Deloitte at that point in the litigation was primarily the failure of plaintiffs to allege adequately that Deloitte possessed the requisite scienter to be accountable under the various theories of recovery. *Cromer*, 137 F.Supp.2d at 493–96. To satisfy this scienter requirement within a claim of a Section 10(b) violation, plaintiffs must show either "(1) ... facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Id.* at 468 (citation omitted). The complaint at that time was deficient in alleging these elements, as it relied on the presence of Deloitte's name and logo on the audits to show Deloitte's knowledge of the allegedly false information contained therein. The April 17 Opinion states:

> The Complaint does not allege that [Deloitte] was even aware of the reports, much less aware that its name and logo were included on the audit reports.... The use of [Deloitte]'s name on the audit reports was undoubtedly of great im-

portance to investors, providing a well-respected international organization's imprimatur on the audits and lending credence to the work of a small, relatively unknown Bermuda entity. Nonetheless, the use of a defendant's name on a document containing misleading information is, by itself, insufficient to constitute scienter.

*Id.* at 493–94. The lack of an allegation of actual or constructive knowledge on the part of Deloitte proved fatal to both causes of action under the Securities Exchange Act, the Section 20(a) claim, and the common law fraud claim. *Id.* at 494. The remainder of plaintiffs' claims were dismissed for similar reasons: the requirement of "actual knowledge" to sustain claims of aiding and abetting common law fraud and aiding and abetting breach of fiduciary duty, and the need to show a "substantive communication" between Deloitte and investors to avoid dismissal of the negligence, gross negligence and malpractice claims. *Id.* at 495–96.

*Motion to Amend*

The May 2 Opinion granted plaintiffs' motion to amend, whereby they repleaded their claims against Deloitte. Plaintiffs' response to the need to allege scienter for Deloitte was to allege that William A. Jack ("Jack"), the DTB partner in charge of the Fund's audits, was Deloitte's agent during the performance of those audits. Plaintiffs alleged that Deloitte conveyed actual authority to Jack through his participation in Deloitte's Global Financial Services Industries practice ("GFSI"), and because of this relationship, under agency law principles, any knowledge acquired by Jack in the course of this agency could be imputed to his principal. *Cromer,* 2002 WL 826847, at *2, *4. Finding that plaintiffs had ade-

quately alleged the existence of an agency relationship, they were permitted to reassert their causes of action against Deloitte.[1] Discovery ensued and has concluded. Deloitte now moves for summary judgment.

**BACKGROUND**

The following facts are undisputed or as shown by the *Cromer* plaintiffs unless otherwise noted.

*The Fund*

The Fund was established in 1995, under the laws of the British Virgin Islands, and began trading United States securities in Spring 1996. As described in the Fund's audit for the year ending December 31, 1996 ("1996 Audit"), the Fund was

designed to permit investors who are tax exempt United States investors or who are neither citizens or residents of the United States to participate in investments in a broad range of highly liquid listed securities, options and financial commodities .... Short sales are utilized when deemed appropriate.

The Fund lost money. Berger's fraud was effectuated by manufacturing false monthly account statements through which he hid the Fund's enormous losses.

*DTB: The Fund's Auditor*

DTB submitted a proposal to Berger to serve as the Fund's auditor by letter dated March 5, 1997. The letter is on stationery bearing the logos of both "Deloitte & Touche," with a Bermuda address, and "Deloitte Touche Tohmatsu International." The proposal is signed by Jack, who is identified as the "Audit Partner" who will be "responsible for supervising all phases of our audit services." Jack is described

---

1. The May 2 Opinion rejected Deloitte's argument that *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), barred the application of agency principles to alleged violations of Section 10(b). *Cromer,* 2002 WL 826847, at *7.

as spending "[t]he majority of his time serving our financial services industry clients" and as someone who "has significant experience with funds like Manhattan." In a section describing DTB's "credentials," the letter states that DTB is "part of Deloitte Touche Tohmatsu International," and notes that Jack "regularly attends international conferences and is in constant contact with our network of Investment Company specialists in the U.S. to ensure that we are abreast of current developments in the industry."

On April 15, 1997, DTB sent an engagement letter for the 1996 Audit to the Fund's Bermuda-based administrator. This letter was also on stationary bearing the logos of "Deloitte & Touche" and "Deloitte Touche Tohmatsu." It identifies Jack as the partner in charge of the audit, and is signed by Jack, below the words "Deloitte & Touche." Similar letters were sent by DTB concerning the audits for the years 1997 and 1998, on November 24, 1997, and December 8, 1998, respectively. The fees for the 1996, 1997 and 1998 audits were $10,000, $10,400, and $14,000, respectively.

The 1996 Audit is dated May 27, 1997, was approved for distribution on May 30, 1997, and was mailed to investors by the Fund administrator between June 25 and July 4, 1997. The audit is addressed to "the Shareholders of Manhattan Investment Fund Ltd.," and is signed "Deloitte & Touche," in a cursive signature, above the date and the logo of "Deloitte Touche Tohmatsu International." The cover letter represents that the audit was conducted "in accordance with auditing standards generally accepted in the United States of America." Audits for the following two years, under substantially similar cover letters, were issued with the dates March 20, 1998, and March 16, 1999. Each audit was a "clean" audit.

It is undisputed that Jack was the partner at DTB in charge of the Fund's audits for the years 1996, 1997 and 1998. In his testimony, Jack stated that he worked "approximately 10 hours each year" on the annual audits for the Fund. In preparing the audit, he used the "Audit System 2," or "AS/2" software program provided by Deloitte.

Plaintiffs contend that DTB ignored evidence of the fraud and generally failed to fulfill its responsibilities as an auditor. After the Securities and Exchange Commission initiated an investigation of the Fund, DTB withdrew their three audits in January 2000.

*The Structure of Deloitte*

Deloitte is organized under Swiss law as a verein, or membership organization. Its members are professional firms engaged in the fields of accounting, auditing and related services. Member firms, like DTB, are separately incorporated legal entities.[2] The "Verein Documents," which a member firm must sign to be able to identify itself as a Deloitte affiliate, delineate the verein's purposes. Among these are to "(a) to further international cooperation and cohesion among the Member Firms; [and] (b) to assure that their practices shall conform to professional standards of the highest quality...." These documents count among Deloitte's obligations to the members firms, the duty to "respect [ ] the independence and integrity of the Member Firms...." The obligations of the member firms to Deloitte include the duty to "be bound" by the "professional standards and systems for quality control

---

**2.** Several individuals have testified that Deloitte is organized in this manner in part to comply with local laws in many of the numerous jurisdictions in which member firms operate, requiring local incorporation of accounting firms.

approved by" Deloitte's Board of Directors. It was a standing resolution of Deloitte that each member firm would implement Deloitte's global objectives, including its "functional and industry programs." On the other hand, there was recognition that each member firm also had to adhere to the laws of the nation in which it practiced.

Under its License Agreement, a member is required to "prominently display" an international practice name such as "Deloitte" when presenting itself to the public. The License Agreement executed by DTB stated, "[n]either this license Agreement, the Supplemental Agreement nor membership in the Verein shall constitute a merger of firms or practices, or be deemed to authorize any of the Verein, the Member Firm or any other Member Firm to act as agent or representative of the other."

Over the course of the 1990's, Deloitte undertook projects to encourage, and at times require, a more consistent manner and level of service throughout the world. It viewed this effort as essential to compete in an ever more global economy for clients whose business transcended national borders. For example, it transmitted increasingly detailed requirements regarding the use, appearance and placement of Deloitte's name and logo on documents issued by member firms. Deloitte published a Professional Practice Manual for the member firms which required as of 1995, that all audits follow its prescribed methodology, including use of AS/2—the software package Jack used in performing the audits for the Fund. The AS/2 includes an audit approach, common documentation, and software for an audit of financial statements. The section of the Professional Practice Manual entitled, "The Audit Approach" begins with these instructions:

Member Firms of Deloitte Touche Tohmatsu International, regardless of the names under which they practice, should comply with the policies and consider the guidance in the planning and performance of audit engagements as set forth in: (1) this Manual; (2) *The Audit Approach* manual; and (3) local professional standards and legal requirements, as applicable.... *The use of* The Audit Approach *manual is required for all audit engagements* covering fiscal periods beginning on or after December 31, 1995.

(emphasis supplied). Deloitte also performed practice reviews of the member firms to ensure that the same quality of service was provided consistently by all member firms on all engagements. The practice reviews measured, among other things, a firm's compliance with the procedures set forth in Deloitte's Professional Practice Manual, its AS/2 manual and local laws. DTB underwent such a review in 1998.

*GFSI*

In March 1997, Deloitte's Executive Committee approved the formation of GFSI and authorized it to develop a worldwide approach to serve the needs of Deloitte's "global financial services clients" and to enhance Deloitte's "financial services presence, capabilities and stature in all major markets in the world." The financial services industries targeted by GFSI were estimated to account for over one-quarter of Deloitte's revenue. As described in a document entitled, "GFSI: Building A World Class Team," distributed internally in 1998, GFSI was created to:

▲ Take on the global leadership of the financial industries practice

▲ Set strategic direction

▲ Implement these strategies through designated FSI leaders in the national practices

▲ Develop global practice standards to guide local practices and ensure consistent delivery worldwide

▲ Prepare global action plans in coordination with local practices, assess performance, and report performance assessments to [the Executive Committee of the Board of Directors]

The creation of GFSI was motivated by the desire to secure large, multi-national financial services firms with revenues in the hundreds of billions of dollars as clients. The founders of GFSI, partners from large Deloitte member firms, saw a need to respond to the changing landscape of the international financial services industry—particularly the major mergers between banks and brokerage firms.

On November 6, 1997, Deloitte announced GFSI to its member firms. It explained that GFSI would transform how Deloitte dealt with the financial services industry, a transformation that mirrored the changes within Deloitte as a whole to become "a global strategic partnership," in part by creating a "global practice culture" through education and training. It admonished that this would mean "giving up some national autonomy to build global capabilities and capacity."

"GFSI: Building A World Class Team" contains several statements of GFSI's goals and methods. The introductory letter from the "GFSI Directorate" tells the member firms:

What is required is the full commitment and engagement of the firm's current and aspiring financial services practitioners, everywhere in the world, to think, plan and act as members of an evolving global team, focused on delivering services in a seamless, universal basis in an industry where the only constant is change.

The same document lists among GFSI's goals the desire to "[c]reate a global practice through exchange programs, increased training and development, sharing of best practices worldwide, and extensive investments in information-sharing and knowledge-building technologies."

GFSI pursued its goals primarily by training, education, development of technology, and encouraging global teamwork. As stated in a 1998 document, GFSI would:

Develop global service line methodologies, tools and techniques, which can then be adapted to the requirements and specific needs of various national markets. We intend to sustain and reinforce knowledge transfers through global practice databases, quality control reviews, training, and cross-border assignments of personnel to client projects.

Initially, GFSI organized itself into one Steering, three Industry, and seven Service Line Committees. One of the Industry Committees was the Investment Funds committee on which Jack served.[3] Conferences were held, and the leaders of GFSI visited various member practices to explain their mission. Member firms were given specific "challenges" related to GFSI goals. The desire to build a "seamless global practice" is discussed repeatedly in the documents produced by GFSI and distributed to the member firms. Deloitte

---

**3.** GFSI's leaders describe the formation of these committees as invitations. Frank Kolhatkar, GFSI Executive Director, testified, "[a]s typically happens when the GFSI group or GFSI and myself, when we want a particular country to contribute and participate, we make a request. They may have some discussion. . . . [I]f they conclude that it is in their interest to join, that is, they will get some value, they may make a decision or they may decline."

reported that GFSI had revenues of over $2 billion in 1999.

As noted, GFSI's goals included the setting of consistent, global standards for the delivery of services; the 1998 GFSI Action Plan counts among its overarching goals the creation of "standardized methodologies for delivery of Audit services on a worldwide basis." Methods for improving communication between firms were also mandated, as demonstrated by a presentation at a 1997 GFSI conference indicating that use of a verein-wide email system would be required. There are other examples that show that at least part of GFSI's goal was cross-border standardization of member firms' practices. The March 1997 "White Paper" states:

> ... auditing in the 1990s needs common methodologies, tools, networks, interdisciplinary teams, powerful lead client service partners, centers of excellence and global consultation.... When we put aside our differences, marshal our resources and collaborate to find solutions to issues and opportunities, we can accomplish much. Witness the world-wide implementation of AS/2, the agreement on a global approach to performing an audit....

On the other hand, other documents reflect that GFSI did not operate as a top-down, command and control operation that had the intention or capacity to direct every aspect of the member firms' operations. In fact, many of the GFSI documents belie that desire, or even that possibility. Repeatedly, the GFSI communications sent to the member firms encourage their participation, and urge their cooperation, but do not require it. A 1998 letter to leaders of member firms reads, "... we need your support and look for-

ward to you fully embracing the 1998 GFSI Action Plan and implementing the country specific plans that will permit us to build a world class practice. Please champion and support your country and regional GFSI leaders." The creators of GFSI describe the process of building the practice as one of campaigning for its acceptance.

*Jack's involvement in GFSI*

Jack was one of the original seven members of GFSI's Investment Funds Committee.[4] The other committee members were from the United States, France, the United Kingdom, South Africa, Luxembourg and Australia. Jack was invited to join in March 1997, and communicated his formal acceptance on June 5, 1997, adding that his partners recognized "the importance of this initiative and have given me their full support." This committee's function was described in 1998, as follows:

> [Deloitte] enjoys a significant edge in certain countries in the investment funds industry. The Investment Management team will focus on spreading this expertise to other markets through activities such as technical training, bid process support [and] eminence-building....

Jack was invited to join the committee because of his expertise in off-shore investment funds and was the only Bermuda member of any GFSI committee. His Deloitte biography includes a reference to his membership in GFSI, which is described as "charged with further integrating our global funds practices." Jack's committee held its first meeting in September 1997.

Jack participated in GFSI meetings, in person and by teleconference. He made presentations at GFSI meetings on invest-

---

**4.** At different times in GFSI's history, this group was also called the "Investment Management Committee."

ment funds and off-shore funds. For example, at a July 1997 GFSI conference, Jack and four colleagues presented a panel discussion entitled "Offshore Investment Management Practice." The panel described the market size of off-shore funds as $2.4 trillion. In addition to providing the audience with general information on how such funds are created, the panel described the various types of funds, including funds like the Fund at issue here, and their advantages and disadvantages. Jack's responsibilities as a member of GFSI included learning "in precise detail" the needs, strengths and weaknesses of relevant investment fund practices, including "details of assignments already performed." He undertook responsibility for giving advice and assistance to member firms in Aruba, the Bahamas, Barbados, British Virgin Islands, and the Netherlands Antilles, among other places.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific

facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002). Thus, in determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

### The Law of Agency

Under New York law,[5] "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.,* 266 F.3d 112, 122 (2d Cir.2001) (citation omitted); *see also Restatement (Second) of Agency* § 1 (1958). To bind a principal, "an agent must have authority, whether apparent, actual or implied." *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 122 (2d Cir.1998). Where an agency relationship exists, "knowledge acquired by an agent acting within the scope of its agency is imputed to the principal, even if the information was never actually communicated." *N.Y. Marine,* 266 F.3d at 122.

Actual authority "is created by direct manifestations from the principal to the agent." *Reiss v. Société Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 748 (2d Cir.2000) (citation omitted); *see also Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1088 (2d Cir.1997); *Minskoff v. Am. Express Travel Related*

---

5. As discussed in the May 2 Opinion, "there does not appear to be any substantive difference between federal common law principles of agency and New York Agency law...."

*Cromer,* 2002 WL 826847, at *4 n. 5. Therefore, as was the case on the motion to amend, this Opinion "will rely on both sources of agency law." *Id.*

*Serv. Co.,* 98 F.3d 703, 708 (2d Cir.1996). The consent for actual authority may be either express or implied from "the parties' words and conduct as construed in light of the surrounding circumstances." *Riverside Research Inst. v. KMGA, Inc.,* 108 A.D.2d 365, 489 N.Y.S.2d 220, 223 (1st Dep't 1985), *aff'd,* 68 N.Y.2d 689, 506 N.Y.S.2d 302, 497 N.E.2d 669 (1986); *see also Minskoff,* 98 F.3d at 708. "[I]mplied actual authority . . . is dependent on verbal or other acts by a principal which reasonably give an appearance of authority" in a manner that is "brought home to the agent." *Greene v. Hellman,* 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980); *see also Fed. Ins. Co. v. Diamond Kamvakis & Co.,* 144 A.D.2d 42, 536 N.Y.S.2d 760, 762 (1st Dep't 1989). Whether actual authority exists "depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 702 (2d Cir.1990).

■ The definition of the scope of an agency has, under New York law, "not been an unchanging one." *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979). Social policy has broadened the definition over time such that today:

> no longer is an employer necessarily excused merely because his employees, acting in furtherance of his interests, exhibit human failings and perform negligently or otherwise than in an authorized manner. Instead, the test has come to be whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.

*Id.* (citation omitted). The New York Court of Appeals has acknowledged that this principle is "more simply said than applied," but has offered the following factors for consideration in determining whether work was within the scope of the employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Id.* at 303, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (*citing Restatement (Second) of Agency,* § 229) (other citations omitted); *see also Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997); *Adams v. N.Y.C. Transit Authority,* 211 A.D.2d 285, 626 N.Y.S.2d 455, 461 (1st Dep't 1995).

The law presumes that it is fair to find that that which the agent knows, the principal knows as well, because it is also presumed that in the normal course of their relationship, the agent will have a duty to disclose information acquired in the course of the agency. The Restatement puts it this way: "[t]he liability of a principal because of the knowledge of the agent is based upon the existence of a duty on the part of the agent to act in light of the knowledge which he has." *Restatement (Second) of Agency* § 272, cmt. a (1958); *see also Torres v. Pisano,* 116 F.3d 625, 637 (2d Cir.1997). Agency law therefore creates vicarious liability not out of a legal fiction, but from a recognition of how business is actually to be conducted between a principal and its agent.

The question of whether an agency relationship exists is "a mixed question of law and fact" that should be submitted to a jury "[u]nless the facts are insufficient to support a finding of agency or there is no dispute as to the historical facts. . . ." *Ca-*

*brera v. Jakabovitz,* 24 F.3d 372, 385–86 (2d Cir.1994); *see also Riviello* 47 N.Y.2d at 303, 418 N.Y.S.2d 300, 391 N.E.2d 1278. "Whether an employee was acting within that scope [of employment] at a particular time requires a fact-intensive inquiry. The ultimate determination is ordinarily for the jury, although it can be made as a matter of law in some instances." *Girden v. Sandals International,* 262 F.3d 195, 205 (2d Cir.2001) (citation omitted); *see also Nationwide Life Ins. Co. v. Bankers Leasing Assoc., Inc.* 182 F.3d 157, 161 (2d Cir.1999).

*The Plaintiffs' Theories*

In opposition to Deloitte's motion for summary judgment, plaintiffs have put forward two theories. First, they allege that Jack was Deloitte's agent through his participation on the Investment Funds Committee of GFSI, that he acquired knowledge about the Fund's audits during the course of that agency, and that his knowledge may be imputed to Deloitte. Second, they argue that the Fund's audits can be directly attributed to Deloitte because of the control Deloitte exercised over DTB, and Deloitte's purported admission that it is an auditor. Because there is a genuine dispute over material facts precluding summary judgment on the plaintiffs' first theory of recovery, it is unnecessary at this time to determine whether its alternative theory could also support liability.

*Agency Through Jack's Participation in GFSI*

■ The plaintiffs have presented sufficient evidence to establish that Deloitte requested and Jack agreed that Jack would act on its behalf when he accepted its invitation to serve on the Investment Funds Committee of GFSI. The record presented with this motion would also permit a jury to find that Jack's work on behalf of Deloitte generally, and GFSI specifically, was subject to Deloitte's con-

trol. The more complex question is whether the plaintiffs have shown that the knowledge Jack acquired about the Fund's audits was acquired within the scope of the agency. Deloitte urges that even if Jack was their agent for some purposes as a result of his participation in GFSI, his work for this program was too attenuated from his role as the Fund's auditor for knowledge of the audit to be within the scope of his agency. In other words, even if he on occasion donned a Deloitte hat, Jack was wearing solely his DTB hat when he acquired knowledge of the Fund's audits.

While Deloitte may very well succeed in showing that the overarching goal of GFSI's activities was the acquisition of clients that do not resemble the Fund, there is evidence that Jack was invited to join GFSI precisely because of his experience with and expertise in engagements like the Fund. His deposition testimony, and documents from GFSI conferences, show that Jack actively participated in GFSI presentations about off-shore investment funds like the plaintiffs' Fund. If GFSI invited Jack to join in order to incorporate the work Jack typically performed within GFSI's mission, then it cannot be said that audits of the size and kind he performed for the Fund were outside the scope of his agency. Put another way, if the auditing of off-shore investment funds was not within the scope of Jack's participation in GFSI, then why did GFSI ask Jack to join?

The plaintiffs have also presented evidence to raise a question of fact as to whether knowledge about the existence and quality of DTB's auditing of funds like the plaintiffs' Fund was within the scope of the agency. Again, a jury could find that Jack was chosen to join GFSI because of his expertise in off-shore investment funds such as the Fund, and that his partic-

ipation in GFSI required him to acquire and share knowledge about how best to serve and audit these funds, to evaluate how well Deloitte and its member firms were currently performing this function, and to lead efforts to improve that performance. Based on this evidence, a jury could conclude that Jack's agency relationship with Deloitte encompassed knowledge he acquired in his work as an auditor, and the standards applied in performing that work.

In sum, the plaintiffs have pointed to sufficient facts in the record such that a reasonable jury, assessing the substance of Jack's involvement in GFSI, could find that it was within the scope of his agency to acquire knowledge of the existence and quality of the Fund's audits. A jury would also be entitled to find that Deloitte expected Jack to report, based on his membership in GFSI, any deficiencies of which he was aware or which he uncovered in the performance of audits of off-shore investment funds by the member firms, particularly where those deficiencies could be remedied through improvements in the manuals and systems circulated by Deloitte, or where those deficiencies might, if detected and uncorrected, threaten Deloitte's reputation in the field and ability to compete for this business.

Deloitte contends that, in addition, plaintiffs must show that Jack was acting "primarily" for Deloitte's benefit when he acquired knowledge of the Fund's audits. As described above, for an agency relationship to exist, an agent must be acting "on behalf" of the principal, with consent and subject to control. The principal case on which Deloitte relies for the "primary benefit" test is *Northwestern Nat'l Ins. Co. v. Alberts,* 769 F.Supp. 498, 508 (S.D.N.Y. 1991), which, in evaluating the scope of authority granted by a power of attorney, relied upon a section the Restatement of Agency which seeks to distinguish a principal-agent relationship from a buyer-broker relationship. *See Restatement (Second) of Agency* § 14(k). Nothing in *Northwestern* suggests that any change is required in the black letter law of agency. More recently, *Louros v. Cyr,* 175 F.Supp.2d 497, 516 (S.D.N.Y.2001), relied on *Northwestern's* formulation in concluding that a power of attorney had not created a fiduciary relationship. The remaining case relied on by Deloitte, *Maung Ng We v. Merrill Lynch & Co.,* No. 99 Civ. 9687(CSH), 2000 WL 1159835, at *9 (S.D.N.Y. Aug.15, 2000), discussed the issue of benefit, and cited to cases that used the concept of benefit, in order to analyze whether a transaction was "on account of" the parent corporation or simply undertaken by the subsidiary for its own purposes. Here, the plaintiffs have presented sufficient evidence to support a finding that Jack's work with GFSI, and knowledge he acquired about off-shore investment funds during that agency, was "on account of" Deloitte.

Deloitte also contends that it cannot, in any event, be held liable for the 1996 Audit (as opposed to the later two audits) since Jack's letter advising Deloitte of his decision to join GFSI is dated June 5, 1997, nine days after the date given to the audit: May 27. As the proximity of these dates indicates, Jack's work on the 1996 Audit occurred in the same period as his consideration of the invitation to join GFSI. Plaintiffs argue that even if the auditing work was performed before consent to act as an agent was given, Deloitte had a duty to retract any false statements from a previously issued audit. The plaintiffs have created a question of fact with regard to the starting point for Jack's agency, and it is for a jury to determine when Deloitte's liability, if any, should begin, and whether it had a duty to retract.

*Additional Arguments*

Deloitte attacks two of plaintiffs' causes of actions on grounds related to the agency theory. Both of these arguments lack merit.

First, relying on *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 430 (S.D.N.Y.2000), it asserts that plaintiffs must show that they knew Jack was acting as Deloitte's agent. The discussion in *Gabriel Capital*, and the case on which it rests, *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir.1998), are easily reconciled with the plaintiffs' evidence. In *Gabriel Capital*, plaintiffs claimed that the relationship between agent and principal was obscured to their detriment. *See Gabriel Capital*, 122 F.Supp.2d at 431. Here, plaintiffs have shown that the audits themselves bore the name and logo of Deloitte, raising at least an issue of fact as to the plaintiffs' reliance on Deloitte's involvement with the audits. In any event, for the reasons described in the opinion certifying this class action, there is a presumption of reliance here. *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 133 (S.D.N.Y. Dec.27, 2001).

Finally, Deloitte argues that plaintiffs must show that Deloitte was a culpable participant in the purported fraud to be liable under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), and that such liability cannot exist by imputing the conduct of an agent. For this principle, they cite *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998), and *In re Deutsche Telekom AG Securities Litigation*, No. 00 Civ 9475(SHS), 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002). The elements of a violation of Section 20(a) are set forth in the April 17 Opinion. *See Cromer*, 137 F.Supp.2d at 483–84. To show culpable participation the plaintiffs must show that Deloitte, as the controlling person, knew or should have known that DTB was engaging in fraudulent conduct but took no steps to prevent the violation. *Id.* at 484. That knowledge can be acquired through its agency relationship with Jack. Neither *Boguslavsky* nor *Deutsche Telekom* forbid the application of agency principles to liability under Section 20(a).

## CONCLUSION

Deloitte's motion for summary judgment is denied.

SO ORDERED.